Turner Construction Company, Respondent, v Seaboard Surety Company et al., Defendants, and General Reinsurance Corporation et al., Appellants.

First Department, March 16, 1982

APPEARANCES OF COUNSEL

*Carole A. Burns* of counsel (*Philip Schlau* with her on the brief; *Newman & Schlau, P. C.*, attorneys), for appellants.

*Robert T. Carlton, Jr.* (*Howard D. Venzie, Jr.,* and *K. Gerard Amadio* with him on the brief; *Sacks, Montgomery, Pastore & Levine* and *Venzie, Phillips & Warshawer*, attorneys), for respondents.

OPINION OF THE COURT

Sullivan, J.

The issue presented is whether the obligee of a performance bond has a direct right of action against the

reinsurers of such bond for the surety's alleged wrongful refusal to honor its obligations thereunder.

On January 2, 1979 plaintiff Turner Construction Company, the prime contractor in the construction of a high-rise office building in New York City, subcontracted the electrical construction at the project to Burmar Electrical Corporation. To secure Burmar's faithful performance Burmar, as principal, and Seaboard Surety Company, as surety, on February 23, 1979, executed and delivered to Turner, as obligee, a performance bond in the penal sum of $9,372,246. In accordance with certain reinsurance agreements it had entered into eight years earlier, Seaboard then ceded a portion of its risk on the performance bond to each of the defendant reinsurers.

In 1971, Seaboard had entered into substantially identical reinsurance agreements (the agreement) with each of the eight defendant reinsurers (only three of which are involved in this appeal), whereby each of the reinsurers agreed to insure a variety of risks which Seaboard would thereafter underwrite. Under the agreement, the reinsurers did not have the right to decline a particular risk; reinsurance was automatically effected and a specific percentage of the risk assigned to each reinsurer on the basis of schedules attached to the agreement.

The agreement provided for the establishment of a fund, which would be managed and controlled by Seaboard, to offset incurred losses. Seaboard was required to furnish a monthly accounting of all reinsurance premiums, commissions, losses and a summary statement of the balance due. Depending on the amount, any balance owed to Seaboard was either to be paid to it directly or carried on account. The reinsurance agreement did not provide for the payment of loss under any of Seaboard's policies directly to Seaboard's policyholders or the beneficiaries.

When Burmar defaulted in the performance of its subcontract on May 8, 1979, Turner made demand upon Seaboard to carry out the performance and completion of the work. Seaboard refused, and notified Turner that it was rescinding the performance bond. Turner thereafter commenced an action on the bond against both Seaboard and

the reinsurers, alleging that it would incur costs and expenses of $4,305,597.56 in excess of the price of the Burmar subcontract to complete the electrical work.

Shortly after issue was joined three of the defendant reinsurers moved for summary judgment dismissing the complaint on the ground that Turner has no right under either the reinsurance agreement or applicable law to maintain a direct action against a reinsurer. Special Term denied the motion, holding that in the circumstances presented such a direct right of action does exist. We agree and affirm.

The sole argument advanced by the reinsurers is that their agreement with Seaboard is purely a contract of indemnity which vests only the reinsured, Seaboard, with a right of action thereon. They correctly note that a reinsurance agreement is a contract of indemnity between the ceding insurer and the reinsurer, whereby for a stipulated portion of the premium the reinsurer obligates itself to reimburse the reinsured for loss sustained on risks insured by it. (See 13A Appleman, Insurance Law and Practice, § 7681, p 480.) Absent provisions to the contrary, "a reinsurer is under no contract obligation to the original insured and does not become liable to him." (*Greenman v General Reinsurance Corp.,* 237 App Div 648, 649, affd 262 NY 701; *Jackson v St. Paul Fire & Mar. Ins. Co.,* 99 NY 124, 129; *People ex rel. Sea Ins. Co. v Graves,* 248 App Div 255, affd 274 NY 312; *Insurance Co. of State of Pa. v Park & Pollard Co.,* 190 App Div 388, affd 229 NY 631.) In the circumstances presented herein, however, the reinsurers' amenability to a direct action by Turner is governed not by common-law principles, but rather, by the Insurance Law of the State of New York and the express terms of the reinsurance agreement, which must be read in consonance with the statute.

Article XII of the reinsurance agreement provides that "[a]ll reinsurance effected in accordance with the provisions of this Agreement shall be subject to the terms and conditions of the Standard Form of General Reinsurance Agreement revised February 1, 1950 of the Surety Association of America and Supplemental Agreement (promulgated March 15, 1951) and any subsequent supplemental

agreement, except to the extent that said Standard Form is inconsistent with the provisions hereof." Section 14 of the standard form of general reinsurance agreement provides that "[t]his Agreement shall be deemed to comply with any law, whenever applicable, which provides that the Obligee or other beneficiary of the Bond shall have the right to maintain an action on such an agreement against the Reinsurer." These provisions must be construed against the background of section 315 (subd 1, par [a]) of the Insurance Law, which was intended to provide the obligee of a surety bond with a direct right of action against a reinsurer in instances where an insurer avails itself of reinsurance to avoid New York's statutory risk limitation.

Under section 47 of the Insurance Law an insurer doing business in this State may not expose itself to a loss of any one risk in an amount which exceeds 10% of its surplus to policyholders, except that any portion of such a risk which is reinsured with an authorized insurer may be deducted in calculating the 10% risk limitation. Thus, through the use of reinsurance credit an insurer is able to increase the volume of its business by accepting risks which would otherwise exceed its statutory limit. The underwriting of surety risks, however, has long been given special consideration by the Legislature. Section 315 (subd 1, par [a])[1] of the Insurance Law, which applies to fidelity and surety risks, requires that, in order to obtain the insurance credit, the reinsurance agreement must be "in such form as to enable the obligee or beneficiary to maintain an action thereon against the ceding insurer jointly with the assuming insurer". The history and purpose of this provision was outlined in a memorandum prepared by the State Insurance Department in 1952: "The provisions of subdivision 1

---

1. Section 315 of the Insurance Law provides in pertinent part:

"1. In applying the limitation of section forty-seven to fidelity and surety risks, the net amount of exposure on any one fidelity or surety risk shall, except as provided in subsection four, be deemed within the limit of ten per cent if such company is protected in excess of that amount by:

"(a) reinsurance, in a company authorized to do such business in this state, which is in such form as to enable the obligee or beneficiary to maintain an action thereon against the ceding insurer jointly with the assuming insurer or, where the commencement or prosecution of actions against the ceding insurer has been enjoined by any court of competent jurisdiction or any justice or judge thereof, against the assuming insurer alone, and to have recovery against such assuming insurer for its share of the liability thereunder and in discharge thereof"

of § 315 were originally enacted in 1919 as § 24 of the former Insurance Law (Chapter 383, Laws of 1919). That legislation was based upon the 'Uniform Surety Provisions' which were recommended for enactment in the several states by the National Convention of Insurance Commissioners at a session held on April 15, 1919. This provision was drafted to protect the insuring public where the insurance company goes beyond the zone of safety and obligates itself under a bond in excess of the statutory limit which it is permitted to do by reinsurance, but in such event the intent was that the obligee or beneficiary should have the added protection of reinsurance. This purpose is quite different from that ordinarily intended by reinsurance, which is taken out to protect the company as a whole rather than to protect the individual insured, whose risk is reinsured." (NY Legis Ann, 1952, p 284.)

In 1939 the Insurance Law was amended to provide: "No credit shall be allowed to any ceding insurer for reinsurance * * * unless the reinsurance shall be payable, in the event of insolvency of the ceding insurer, to its liquidator or receiver" (Insurance Law, § 77, subd 1, as amd by L 1939, ch 882). This provision created a conflict with respect to the reinsurance of surety risks since section 315 (subd 1, par [a]) required that such reinsurance be in such form as to allow the obligee a direct right of recovery against the reinsurer. Subdivision 1 of section 77 was thereafter amended (L 1940, ch 87) "to remove the conflict with § 315 and thereby permit reinsurance of surety bonds to be made directly to the obligee or beneficiary where the direct obligation represented by the surety bond was written for an amount in excess of the statutory limit of the risk." (NY Legis Ann, 1952, p 284.) But, in order to reinstate the requirement of direct payment to the liquidator or receiver in the event of insurer insolvency with respect to all risks other than surety risks, section 77 was again amended in 1952 (L 1952, ch 171), and now reads, in pertinent part: "Except as otherwise provided by section three hundred and fifteen of this chapter, no such [reinsurance] credit shall be allowed any ceding insurer for reinsurance made, ceded, renewed, or otherwise becoming effective after September first, nineteen hundred fifty-two,

unless the reinsurance agreement provides that payments by the assuming insurer shall be made directly to the ceding insurer or to its liquidator, receiver or statutory successor".

Thus, as the legislative history of sections 77 and 315 (subd 1, par [a]) makes clear, in order for an insurer of a surety bond to obtain reinsurance credit it must provide a direct right of action by the obligee against the reinsurer in its reinsurance contracts. It is also clear that section 77, as the general provision applicable to the reinsurance of all types of risks, expressly incorporates, and is subject to, section 315 when surety risks are involved.

That New York law applies to the reinsurance agreement at issue is beyond dispute. The subcontract which is the subject of the performance bond was to be performed entirely in New York. Seaboard is a New York corporation engaged in the insurance business in this State. All of the defendant reinsurers are authorized reinsurers. Turner argues that since the reinsurance agreement expressly incorporates the provisions of the "Standard Form of General Reinsurance Agreement revised February 1, 1950", and section 14 of the standard form states that the reinsurance agreement shall be deemed to comply with any law, whenever applicable, which provides that an obligee shall have the right to maintain an action against the reinsurer, and section 315 (subd 1, par [a]) is such an "applicable" law, the reinsurance agreement provides a direct right of action against the reinsurers.

The reinsurers argue, however, that section 315 (subd 1, par [a]) of the Insurance Law is insufficient in and of itself to create a direct right of action since the statute recognizes the right only when the reinsurance agreement is "in such form" as to allow the bond obligee or beneficiary to maintain a direct action against the reinsurer. They maintain that not only does the reinsurance agreement fail to afford such right by its express terms, but that by implication its provisions reflect an intention not to extend the scope of the agreement beyond that of merely indemnifying the ceding insurer, Seaboard. They cite, for example, a clause providing for reimbursement of Seaboard for paid

losses,[2] which are defined in another article as "the [r]einsurer's share of [l]osses and [l]oss [e]xpenses paid by [Seaboard] less the [r]einsurer's share of loss credits, subrogation recoveries, and salvage received by [seaboard]." The insurers also note the agreement's procedure for periodically tallying credits and debts so that "[a]ny balance due either party as shall be indicated will be remitted by the other within seventy-five (75) days after the close of said month." Finally, they point to article VIII of the reinsurance agreement which requires Seaboard to "furnish to the [r]einsurer satisfactory evidence of payment of loss with respect to which indemnity is afforded by this [a]greement."

Thus, the reinsurers contend that the standard form, including section 14, cannot be read into the reinsurance agreement so as to create a direct right of action because article XII of the reinsurance agreement expressly rejects the terms and conditions of the standard form "to the extent that said Standard Form is inconsistent with the provisions hereof."

We reject the argument that the reinsurance agreement, which provides reinsurance for 75% of the performance bond risk at issue, is not "in such form" as to provide the obligee or beneficiary with a direct right of action against the reinsurers, thereby satisfying section 315 (subd 1, par [a]) of the Insurance Law. Clearly, if the agreement does not provide such a right then Seaboard would have been in violation of the risk limitation provision of section 47 of the Insurance Law, since the penal sum of the bond, which was executed on February 23, 1979, was in excess of 10% of its surplus to its policyholders as shown in its 1979 annual statement. Needless to say Seaboard takes the position that the reinsurance agreement "is in such form" as to comply fully with section 315 (subd 1, par [a]) in providing a direct right of action.

The reinsurance agreement should not be construed to place Seaboard in violation of this State's risk limitation

---

2. Article IX(f) provides, "The Reinsurer shall reimburse the Company for Paid Losses which are in excess of the total of the accumulated Adjusted Reinsurance Commissions plus any unrecovered portion of the Initial Advance."

requirements. "[I]t is well established that a contract should be construed to avoid illegality if possible." (*Loengard v Metal & Thermit Corp.,* 204 F Supp 74, 78; see *Straight Side Basket Corp. v Webster Basket Co.,* 82 F2d 245.) Furthermore, both Seaboard and the reinsurers are presumed to have entered their agreement with knowledge of sections 47 and 315. In the absence of a contrary provision, "the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein, for it is presumed that the parties had such law in contemplation when the contract was made and the contract will be construed in the light of such law". (*Dolman v United States Trust Co. of N. Y.,* 2 NY2d 110, 116.)

Moreover, the reinsurers' interpretation renders section 14 of the standard form meaningless and violates a cardinal rule of contract construction, i.e., that "a court should not 'adopt an interpretation' which will operate to leave a 'provision of a contract * * * without force and effect'". (*Corhill Corp. v S. D. Plants,* 9 NY2d 595, 599, citing *Muzak Corp. v Hotel Taft Corp.,* 1 NY2d 42, 46; *Fleischman v Furgueson,* 223 NY 235, 239.) Applying these principles, we find that article XII of the reinsurance agreement and section 14 of the standard form incorporated therein, vest Turner, as the obligee of a reinsured surety bond, with a direct right of action on the agreement against the reinsurers.

In *Cummings Wholesale Elec. Co. v Home Owners Ins. Co.* (492 F2d 268 [Ca 7th]), the court was confronted with, *inter alia,* the issue of whether reinsurance agreements vested the obligees of a surety bond with a direct right of action against the reinsurers under an Indiana reinsurance statute modeled on section 315 of the Insurance Law. There, article XI of each separate reinsurance agreement contained the following provision: "All reinsurance effected in accordance with the provisions of this Agreement shall be subject to the terms and conditions of the General Reinsurance Agreement (revised February 1, 1950, and as amended from time to time) of the Surety Association of America, except to the extent that said Agreement is inconsistent with the provisions hereof."

Paragraph 14 of the *Cummings* general reinsurance agreements, in language identical to that of section 14 of the standard form of general reinsurance agreement in the instant case, provided as follows: "This Agreement shall be deemed to comply with any law, whenever applicable, which provides that the Obligee or other beneficiary of the Bond shall have the right to maintain an action on such an agreement against the Reinsurer." The reinsurer argued, as do the reinsurers here, that paragraph 14 of the general reinsurance agreement was inconsistent with other provisions of the separate reinsurance agreements and therefore not incorporated therein by article XI. In rejecting this argument, and holding that the reinsurance agreements gave the bond obligees a direct right of action against the reinsurers,[3] the court stated (492 F2d, at p 271): "The Indiana legislature required these reinsurance policies be 'in such form' as to permit the obligee or beneficiary to sue the reinsured and reinsurer jointly. Paragraph 14 of the General Reinsurance Agreement sufficiently satisfies this requirement."

Finally, we note that article XIV(b) of the reinsurance agreement, which provides, *inter alia,* that notwithstanding the insolvency of Seaboard the reinsurance shall nevertheless be payable as provided by section 315 of the Insurance Law, lends further support for our conclusion that the reinsurance agreement contemplates a direct right of action against the reinsurers. This provision tracks not only the language of section 77 of the Insurance Law but also the reinsurance agreement supplemental contract and section 125.1 of the Regulations of the Superintendent of Insurance (11 NYCRR 125.1), and is, in our view, a clear manifestation of intent by Seaboard and the reinsurers to endow fidelity and surety bond obligees with a direct right of action on the reinsurance agreement, a right which remains undiminished even in the event of Seaboard's insolvency.

---

**3.** In holding, however, that such right did not survive the insolvency of the reinsured, the court decided the case on an issue which is not before us and reached a result which in any event would be avoided in this State by virtue of section 315 (subd 1, par [a]) of the Insurance Law which permits the maintenance of a direct action against the reinsurer alone when the commencement or prosecution of an action against the reinsured has been enjoined by a court of competent jurisdiction.

Accordingly, the order, Supreme Court, New York County (OKIN, J.), entered August 19, 1981, denying the motion of defendants General Reinsurance Corporation, Excess and Casualty Reinsurance Association and North American Reinsurance Corporation for summary judgment dismissing the complaint, should be affirmed, with costs and disbursements.

KUPFERMAN, J. P., FEIN and ASCH, JJ., concur.

Order, Supreme Court, New York County, entered on August 19, 1981, unanimously affirmed. Respondent shall recover of appellants $75 costs and disbursements of this appeal.