**ALLSTATE INSURANCE COMPANY,**
Plaintiff,

v.

**ADMINISTRATIA ASIGURARILOR DE STAT; Asigurarea Romaneasca S.A.; Astra S.A.; Carom S.A.; Reaseguradora Albatros; Allami Biztosito Banco De Seguros Del Estado; Caisse Nationale De Reassurance; Ceska Statni Pojistovna; Eastern Marine & Fire Insurance Co.,**
**Ltd.; Instituto Nacional De Reaseguros; Kuwait Insurance Co., S.A.K.; Compania Mercantil De Mundial De Panama, S.A.; Pan Korea Insurance Co.; Philippine Reinsurance Corp.; Pozavarovalna Skupnost Sava; Societe D'Assurance Syrienne S.A.; P.T. Reasuransi Umum Indonesia; Universal Guarantee Insurance Co. of Auckland; Halvanon Insurance Co., Ltd.; Korean Reinsurance Corp.; Milli Reassurans, T.A.S.; Milli Reassurans, R.C.D.; Societe Centrale De Reassurance; Seguros La Territorial, S.A.; Caja Nacional De Ahorro Y Seguro; International Fire & Marine Insurance Co., Ltd.; Grupo Universal De Reaseguros P.T. Asuransi Antar Malayan Bali; Eastern General Reinsurance Corp.; P.T. Asuransi Kredit Indonesia; Aseguradora Mundial, S.A.; Seguros Progreso, S.A.; Mutuelle Centrale Marocaine D'Assurance; Groupe Kleber, Defendants.**

86 Civ. 2365 (DNE).

United States District Court,
S.D. New York.

Dec. 11, 1996.

See also, 163 F.R.D. 196.

Saiber Schlesinger Satz & Goldstein, Newark, NJ (David J. D'Aloia, of counsel), for Allstate Insurance Company.

Rosenman & Colin, New York City (Harry P. Cohen, of counsel), for Groupe Kleber.

## OPINION & ORDER

EDELSTEIN, Senior District Judge:

Currently before this Court is a motion for summary judgment brought by defendant Groupe Kleber ("GK" or "defendant"). For the following reasons, defendant's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

This action arises out of a complex series of insurance transactions involving Allstate Insurance Company ("Allstate" or "plaintiff") and thirty-five defendant reinsurance companies. Although Allstate originally named all thirty-five companies as defendants, due to several stipulated dismissals, this litigation presently is left with only thirty defendant reinsurance companies ("defendants").

This Court previously described the facts underlying this litigation in *Allstate Ins. Co. v. Administratia Asigurarilor De Stat,* 875 F.Supp. 1022, 1023–25 (S.D.N.Y.1995) (the "1995 Opinion"). Nevertheless, because the instant opinion resolves issues raised by just one of this case's numerous defendants, GK, it is necessary to review the facts of this case with a specific focus on GK's alleged role in the relevant insurance transactions.

Allstate is an Illinois corporation "engaged in the business of insurance," headquartered in Northbrook, Illinois. (First Amended Complaint, *Allstate Ins. Co. v. Administratia Asigurarilor de Stat,* 86 Civ. 2365 ("Complaint") at 2 (April 26, 1995).) GK "is a Societe Anonyme registered with the Tribunal de Commerce de Paris." (Affidavit of Paul–Alain Plenet de Badts, *Allstate Ins. Co. v. Administratia Asigurarilor de Stat,* 86

Civ. 2365 ("Plenet Aff.") ¶ 2 (Dec. 16, 1996).) GK's "principal activity is as a reinsurance underwriting agency," and is located in Paris, France. *Id.*

Before outlining the facts of this case, it is helpful to define a number of relevant insurance terms. "Reinsurance" is a form of insurance provided by one insurance company, "the reinsurer," to another insurance company, "the reinsured." *Reinsurance* 661–62 (Robert W. Strain ed. 1980). The objective of reinsurance is to indemnify the reinsured for losses it sustains under insurance policies that the reinsured has issued to the general public. *Id.* at 6–7. Reinsurance contracts typically fall into two categories. *Delta Holdings, Inc. v. National Distillers & Chem. Corp.*, 945 F.2d 1226, 1229 (2d Cir. 1991). A "facultative contract" is an agreement "under which a reinsurer assumes specific risks instead of an entire class of risks." *Id.* A "treaty" is an agreement "under which a reinsurer accepts a percentage participation in all risks of a certain type or class underwritten by the primary insurer (or another reinsurer) during a specified period of time." *Id.* A "proportional reinsurance treaty" is a specific type of reinsurance treaty, pursuant to which a "reinsurer participates in specific risks on a percentage basis." Graydon S. Staring, *The Law of Reinsurance* § 2:4, at 5 (1993).

A "retrocession is a form of reinsurance provided by one reinsurance company, the "retrocessionaire," to another reinsurance company, the "retrocedent." *Reinsurance* at 662. The goal of retrocession is to indemnify the retrocedent for losses that the retrocedent sustains under the reinsurance policies that it has issued to insurance companies. *Id.* at 587–88. Finally, a "pool" is:

> Any joint underwriting operation of insurance or reinsurance in which the participants assume a predetermined and fixed interest in all business written. Pools are often independently managed by professionals with expertise in the classes of business undertaken, and the members share equally in the premiums, losses, expenses and profits.

*Reinsurance* at 659.

In 1976 and 1977, Allstate's former wholly-owned subsidiary, Northbrook Excess and Surplus Insurance Company ("NESCO"), "provided umbrella liability and excess liability insurance coverage on a layered basis to a large number of commercial insureds (the "NESCO risks")." (Complaint at 8.) In accordance with its customary practice, NESCO covered a portion of its liability under the policies it had issued by purchasing reinsurance from a number of reinsurance carriers. (Affidavit of Daniel W. Kummer in Support of Plaintiff's Motion to Compel Pre–Filing Security, *Allstate Ins. Co. v. Administratia Asigurarilor de Stat*, 86 Civ. 2365 ("Kummer Aff.") ¶ 5 (Oct. 9, 1992).) One of the reinsurance carriers from which NESCO purchased reinsurance was Seguras La Republica ("SLR"), a Mexican insurance and reinsurance company. *Id.;* (Memorandum of Law on Behalf of Allstate Insurance Company in Opposition to Groupe Kleber's Motion for Summary Judgment, *Allstate Ins. Co. v. Administratia Asigurarilor de Stat*, 86 Civ. 2365 ("Pltf.'s Opp. Memo") at 5 (June 17, 1994).)

NESCO obtained this reinsurance through its reinsurance intermediary, Interbroker, S.A. ("Interbroker"), which placed the reinsurance with CJV Associates, Inc. ("CJV"), a reinsurance intermediary located in New York City that had represented itself as acting on behalf of SLR. (Kummer Aff. ¶ 6); (Pltf.'s Opp. Memo at 5–6); (Certification of James Kirkland, *Allstate Ins. Co. v. Administratia Asigurarilor de Stat*, 86 Civ. 2365 ("Kirkland Cert.") ¶ 4 (May 12, 1987).) Allstate alleges that CJV "acted as the agent of defendants in the development, underwriting and servicing of reinsurance and retrocession business for defendants." (Complaint at 9.) The reinsurance SLR provided to NESCO through CJV "is evidenced by four 'reinsurance treaties' or contracts for reinsurance," (the "NESCO Treaties"). (Pltf.'s Opp. Memo at 6); (Kummer Aff. ¶ 7 & Exh. B.) NESCO and SLR entered into two of these reinsurance contracts in each of the years 1976 (the "1976 NESCO Treaties") and 1977 (the "1977 NESCO Treaties"), thereby creating four reinsurance treaties. (Complaint at 9.)

SLR, in turn, entered into retrocession agreements with defendants, whereby defendants agreed to be SLR's retrocessionaire. *Allstate,* 875 F.Supp. at 1024. SLR's retrocession arrangement with defendants was facilitated by CJV, because "[u]nbeknownst to Allstate at the time, CJV was part of a group of affiliated and related companies known as the POSA Group." (Pltf.'s Opp. Memo at 6); (Kummer Aff. ¶ 8.) The POSA Group was the managing agent of a reinsurance pool referred to as the "POSA Pool." (Pltf.'s Opp. Memo at 6.) The POSA Pool's "members consisted of a number of small third world insurance and reinsurance carriers" and was "formed for the purpose of combining or 'pooling' the financial resources of its members in order to compete for reinsurance business in the international market." (Kirkland Cert. ¶ 3.) Defendants are all alleged to have been members of the POSA Pool. (Complaint at 9.)

The POSA Pool "authorized the POSA Group to obtain and place reinsurance business, including retrocession insurance, on [the POSA Pool's] behalf." (Pltf.'s Opp. Memo at 6); (Kirkland Cert. ¶¶ 5, 7.) Allstate also contends that the POSA Pool members "authorized the POSA Group to service the reinsurance business placed in the POSA Pool, including the handling and reporting of claims, [and] the accounting, receipt, and remission of premiums on the business written." (Pltf.'s Opp. Memo at 6); (Kirkland Cert. ¶¶ 5, 7.) CJV, as part of the POSA Group, "placed NESCO business into the POSA Pool and each of the member reinsurers was assigned a specific percentage participation in the NESCO reinsurance." (Pltf.'s Opp. Memo at 7); (Kummer Aff. ¶ 8.)

Allstate alleges that, between 1976 and 1980, NESCO paid $9,770,000 in premiums to its reinsurance intermediary, Interbroker, for reinsurance coverage. (Complaint at 11); (Pltf.'s Opp. Memo at 7); (Kummer Aff. ¶ 9.) Interbroker, in turn, paid these premiums to CJV at its offices in New York City. (Pltf.'s Opp. Memo at 7); (Kummer Aff. ¶ 9.) Each member of the POSA Pool received a portion of NESCO's premiums according to its respective percentage participation of assumed

risk of NESCO's claims. (Pltf.'s Opp. Memo at 7); (Kummer Aff. ¶ 8.)

Allstate also contends that, between 1976 and 1980, NESCO received payment on claims under the NESCO Treaties which were submitted to CJV. (Kummer Aff. ¶ 10.) Because the NESCO Treaties provided excess coverage, claims volume was not heavy during this time period and, therefore, the amount of the claims submitted under the NESCO Treaties was small in comparison to the premiums which NESCO paid. *Id.* Allstate maintains that NESCO received approximately $575,000 in reinsurance from defendants. *Id.;* (Complaint at 11.) Allstate also alleges that, even though it already paid SLR $9,770,000 in reinsurance premiums, "[a]s of December 31, 1985, Allstate project[ed] with reasonable certainty that it w[ould] pay the additional sum of $8,539,828 on the NESCO risks covered by the [NESCO Treaties] for which it ha[d] received no payment or security from defendants." (Kummer Aff. ¶ 10); (Complaint at 11.)

In 1980, however, as the volume of NESCO's reinsurance claims increased, "payment on the reinsurance claims that NESCO submitted to CJV abruptly stopped." (Pltf.'s Opp. Memo at 7); (Kummer Aff. ¶ 11.) At approximately this time, "CJV's operations were shut down and the POSA Group disbanded soon after a federal grand jury sitting in the Southern District of New York initiated a criminal investigation into the activities of the POSA Group." (Pltf.'s Opp. Memo at 7); (Kummer Aff. ¶ 11); (Kirkland Cert. ¶ 8.) As a result, NESCO contacted SLR directly in an effort to obtain payments on unpaid reinsurance claims which the POSA Group had placed into the POSA Pool. (Pltf.'s Opp. Memo at 7); (Kirkland Cert. ¶ 8.) SLR then informed NESCO that NESCO's reinsurance had been placed by CJV, as part of the POSA Group, into the POSA Pool, and that each POSA Pool member participating in the NESCO business was responsible for the percentage of claims coming due under the NESCO Treaties according to its respective percentage participation in NESCO's reinsurance coverage. (Pltf.'s Opp. Memo at 7–8); (Kummer Aff. ¶¶ 12–14); (Kirkland Cert. ¶ 8.) SLR also informed

NESCO that SLR "did not have the financial resources to pay the full amount of the claims coming due under the NESCO [T]reaties." (Kirkland Aff. ¶ 8); (Kummer Aff. ¶ 15.) The alleged POSA Pool members are the defendants in the instant litigation. (Complaint at 9.)

In 1985, NESCO merged into Allstate, thereby rendering Allstate the successor-in-interest to NESCO. (Complaint at 2); *Allstate*, 875 F.Supp. at 1024. Also in 1985, Allstate entered into an agreement with SLR under which SLR both agreed to pay to Allstate only SLR's own percentage participation in the NESCO reinsurance claims, and assigned to Allstate all of SLR's rights against other POSA Pool members concerning the NESCO reinsurance (the "1985 Assignment"). (Pltf.'s Opp. Memo at 8); (Kummer Aff. ¶ 15); (Kirkland Cert. ¶ 10.)

Over a decade ago, Allstate commenced the instant litigation against all of the alleged members of the POSA Pool who participated in NESCO's reinsurance business, including GK. (Pltf.'s Opp. Memo at 8.) Allstate seeks to "recoup its payments and to obtain a judgment declaring the members of the POSA Pool liable for future claims arising under the [NESCO] Treaties." *Id.* Allstate alleges three causes of action. First, Allstate contends that, as SLR's assignee, Allstate is entitled to sue defendants based on the retrocession agreements between SLR and defendants. (Complaint at 12.) Second, Allstate maintains that defendants and NESCO had an implied contract and that Allstate, as NESCO's successor-in-interest, is entitled to recover on that implied contract. *Id.* at 13. Third, Allstate brings a claim for unjust enrichment. *Id.* at 16.

The parties' respective versions of the facts surrounding GK's alleged reinsurance of SLR create three issues relevant to this Court's resolution of the instant summary judgment motion. First, Allstate contends that GK was a member of the POSA Pool. *See, e.g.,* (Kirkland Cert. ¶¶ 6–8). GK, however, maintains that it has never been a part of the POSA Pool. *See, e.g.,* (Certification of Stephane Benhamou, *Allstate Ins. Co. v. Administratia Asigurarilor de Stat, et al.,* 86 Civ. 2365 ("Benhamou Cert.") ¶ 8 (Oct. 11, 1993).) Second, GK submits a retrocession agreement (the "Retrocession Agreement"), by which SLR cedes a "up to a 70% [q]uota [s]hare" of its reinsurance business to an unspecified retrocessionaire. (Benhamou Cert. at Exh. B.) Allstate asserts that GK was the retrocessionaire under this agreement, (Pltf.'s Opp. Memo at 17–19), while GK claims that it was not. (GK Memo at 5–6.) Instead, GK contends that it was acting as an agent for its principals, Nissan Fire & Marine Insurance Co., Ltd. ("Nissan") and Compagnie Centrale de Reassurance ("CCR"), as "members of the Groupe Kleber Pool, a reinsurance pool managed by Groupe Kleber." (GK Memo at 5–6.) GK thus argues that Nissan and CCR, rather than GK, are the true retrocessionaires under the Retrocession Agreement. *Id.* Third, Allstate claims that, in addition to the Retrocession Agreement, there is another retrocession agreement between SLR and GK. Allstate, however, presents no evidence of this other retrocession agreement.

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure ("Rule") 56, Groupe Kleber moves "for an Order granting summary judgment dismissing in its entirety the Complaint of Plaintiff Allstate ... insofar as it respects Groupe Kleber, and awarding such other relief as the Court deems just and proper." (GK Memo at 1 (footnote omitted).) Allstate opposes the substance of GK's motion for summary judgment, and, in addition, argues that GK's motion is premature. Because Allstate's argument that summary judgment is untimely imperils this Court's ability to resolve GK's summary judgment motion, this Court will address the timeliness issue first.

### I. The Timeliness of GK's Motion For Summary Judgment

Allstate argues that GK's motion for summary judgment is premature because "Allstate has not had an opportunity to pursue discovery from Groupe Kleber." *Id.* at 15–16. Allstate asserts that this Court stayed discovery from November 1986 through February 1992, during the pendency of a number of jurisdictional motions before this Court.

(Order, *Allstate Ins. Co. v. Administratia Asigurarilor de Stat,* 86 Civ. 2365 at 2 (Nov. 18, 1986) ("November 1986 Order").) On February 25, 1992, this Court denied the jurisdictional motions in their entirety. *See* (Order, *Allstate Ins. Co. v. Administratia Asigurarilor de Stat,* 86 Civ. 2365 (Feb. 25, 1992) ("February 1992 Order").) Despite this Court's denial of defendants' jurisdictional motions, Allstate claims that the February 1992 Order did not lift this Court's stay of discovery. (Pltf.'s Opp. Memo at 16.)

Allstate also argues that, "[f]ollowing this Court's decision on those [jurisdictional] motions[,] Allstate moved to compel the defendant reinsurers which had prematurely filed answers to post the required security" (the "pre-filing security motion") under New York Insurance Law, Section 1213 ("Section 1213"), because each answering defendant was an unauthorized foreign reinsurer. *Id.* Allstate asserts that, to "avoid incurring the substantial expense of taking discovery in foreign countries from numerous reinsurers," Allstate elected to await decision on its pre-filing security motion before conducting discovery. *Id.* at 16. This Court denied Allstate's pre-filing security motion on January 19, 1995. *See Allstate,* 875 F.Supp. at 1030.

GK counters Allstate's arguments that GK's motion for summary judgment is premature on several grounds. First, GK asserts that the November 1986 Order expressly precluded all discovery except that relating to issues of jurisdiction and *forum non conveniens.* (Reply Memorandum of Law In Further Support of Groupe Kleber's Motion For Summary Judgment Dismissing The Complaint, *Allstate Ins. Co. v. Administratia Asigurarilor de Stat,* 86 Civ. 2365 ("GK Reply Memo") at 6 n. 7 (July 22, 1994).) GK then maintains that "Allstate concedes that '[t]he purpose of this Order was to stay merits discovery until the Court had ruled on the various motions to dismiss.'" *Id.* (quoting Affidavit of James H. Forte in Opposition to Groupe Kleber's Motion for Summary Judgment, *Allstate Ins. Co. v. Administratia Asigurarilor de Stat,* 86 Civ. 2365 ("Forte Aff.") ¶ 2 (June 17, 1994).) Accordingly, GK argues, "as a practical matter, the [November 1986 Order] could have been lifted as a matter of course and, therefore, was not an impediment to merits discovery after th[is] Court ruled on the motions to dismiss." *Id.*

Second, GK argues that, although Allstate's Section 1213 motion (which this Court has since denied) may bar GK from filing a pleading, it does not preclude GK from filing a motion for summary judgment. (GK Reply Memo at 2–4.) GK distinguishes between pleadings and motions, and argues that because Section 1213 precludes unauthorized insurers and reinsurers only from filing *"pleadings,"* GK is "entitled to make a *motion* asserting a substantive defense prior to [the] posting of security" under Section 1213. *Id.* (emphasis added).

Third, GK maintains that, pursuant to Rule 56(f), "Allstate is not entitled to discovery at this time as a matter of law." *Id.* at 4–5. In support of this assertion, GK contends that Allstate has not complied with the Second Circuit's decision in *Burlington Coat Factory Warehouse v. Esprit De Corp.,* 769 F.2d 919, 925 (2d Cir.1985), which sets forth the burden of production on a party seeking to forestall summary judgment, pursuant to Rule 56(f), due to incomplete discovery. *Id.* at 5–8.

Rule 56(f) applies where a non-moving party seeks to delay a court's consideration of a motion for summary judgment due to the non-moving party's inability to produce facts sufficient to meet is burden of production in response to the motion for summary judgment. Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). Rule 56(f) requires a court to ensure that parties have a reasonable opportunity to make their record before the court rules on a motion for summary judgment. *Sundsvallsbanken v. Fondmetal,*

*Inc.,* 624 F.Supp. 811, 814–15 (S.D.N.Y.1985) (citation omitted). It protects a party opposing a summary judgment motion "who for valid reasons cannot by affidavit—or presumably by any other means authorized under Rule 56(e)—present 'facts essential to justify his opposition' to the motion." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2740, at 529–30 (2d ed. 1983). Rule 56(f) thus "allows a party who has no specific material contradicting his adversary's presentation to survive a summary judgment motion if he presents valid reasons justifying his failure of proof." *Id.* § 2740, at 530. Because it is a safeguard against premature grants of summary judgment, Rule 56(f) "should be applied with a spirit of liberality." *Id.* § 2740, at 532 (footnote omitted).

Commentators note, however, that "the rule will not be liberally applied to aid parties who have been lazy or dilatory." *Id.* § 2740, at 535. As the Second Circuit explained in *Burlington,*

> [c]laims of a need for more discovery from a party who has diligently used the time available ... should be given more favorable consideration than claims by one who has allowed months to pass unused. Moreover, when alerted to a forthcoming motion for summary judgment, a party wanting more time for discovery should seek, through negotiation with the other party, and if necessary, through application to the district court, an appropriate discovery schedule. A party who both fails to use the time available and takes no steps to seek more time until after a summary judgment motion has been filed need not be allowed more time for discovery absent a strong showing of need.

769 F.2d at 927–28 (emphasis added).

Moreover, while "Rule 56(f) discovery is specifically designed to enable a plaintiff to fill material evidentiary gaps in its case ... it does not permit a plaintiff to engage in a 'fishing expedition.'" *Capital Imaging Assoc. v. Mohawk Valley Medical Assoc., Inc.,* 725 F.Supp. 669, 680 (N.D.N.Y.1989) (citing *Waldron v. Cities Serv. Co.,* 361 F.2d 671, 673 (2d Cir.1966)) (citations omitted), *aff'd,* 996 F.2d 537 (2d Cir.), *cert. denied,* 510 U.S.

947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). "Rule 56(f) is not a shield against all summary judgment motions." *Sundsvallsbanken* 624 F.Supp. at 815. Rather, "[l]itigants seeking relief under the rule must show that the material sought is germane ... and that it is neither cumulative nor speculative." *Id.* (citation omitted). A party opposing summary judgment who chooses to utilize Rule 56(f) "directly and forthrightly invokes the trial court's discretion." 6 James W. Moore, Moore's Federal Practice ¶ 56.24, at 56–797 (2d ed. 1995). Accordingly, a district court's denial of a request for more time under Rule 56(f) "is subject to reversal only if it abused its discretion." *Burlington,* 769 F.2d at 925; *see also Contemporary Mission v. United States Postal Serv.,* 648 F.2d 97, 105 (2d Cir.1981).

The Second Circuit has articulated a four-part analysis to determine whether a party's request under Rule 56(f) is appropriate. Rule 56(f) requires the opponent of a motion for summary judgment who claims to be unable to produce evidence in opposition to the motion to file an affidavit explaining:

1) the nature of the uncompleted discovery, i.e. what facts are sought and how they are to be obtained; *and*

2) how those facts are reasonably expected to create a genuine issue of material fact; *and*

3) what efforts the affiant has made to obtain those facts; *and*

4) why those efforts were unsuccessful.

*Burlington,* 769 F.2d at 926 (citations omitted) (emphasis added).

This Court is persuaded by all three of GK's arguments in favor of immediately considering its motion for summary judgment. First, this Court finds that this Court's November 1986 Order staying discovery did not preclude Allstate from undertaking discovery on the merits of this litigation. That Order expressly provides that "the parties shall not engage in any discovery except with respect to issues of jurisdiction and *forum non conveniens unless specifically allowed by the Court upon application.*" (November 1986 Order at 2 (emphasis added).) Plainly, this Order did not preclude

discovery. It merely directed that discovery proceed only with this Court's permission. As a result, Allstate cannot plausibly argue that the November 1986 Order barred Allstate from undertaking merits discovery regarding GK, or any other defendant.

Second, this Court finds that Section 1213 does not preclude GK's summary judgment motion. To reiterate, GK argues that, even if Section 1213 precludes it from filing a pleading before posting security, GK is entitled to make a motion for summary judgment without posting security. According to its terms, Section 1213 precludes an unauthorized insurer or reinsurer from filing a *pleading* without first posting adequate security. N.Y.Ins.L. § 1213(c)(1)(A) (McKinney 1985). Section 1213 directs an unauthorized insurer or reinsurer who is a defendant in a civil action to post a bond or security equivalent to the amount for which judgment is sought prior to "fil[ing] any pleading in any proceeding against it." *Id.* As Allstate correctly points out, (Pltf.'s Opp. Memo at 11), the purpose of this statute is to assure that a New York resident or non-resident authorized to do business in New York is able to recover any judgment it obtains against an unauthorized insurer or reinsurer. *See* N.Y.Ins.L. 1213(c)(1)(A) (McKinney 1985); *Dean Constr. Co. v. Agricultural Ins. Co.*, 42 Misc.2d 834, 835–36, 249 N.Y.S.2d 247 (N.Y.Sup.Ct.1964), *aff'd*, 22 A.D.2d 82, 254 N.Y.S.2d 196 (N.Y.App.Div.1964) (discussing N.Y.Ins.L. § 59–a, the statutory predecessor to Section 1213).

Federal Rule of Civil Procedure 7(a) defines the term "pleadings" to include only eight submissions, including two which may be filed only pursuant to court order. Rule 7(a) limits pleadings to a complaint, an answer, a reply to a counterclaim, an answer to a cross-claim, a third party complaint, and a third party answer. Fed.R.Civ.P. 7(a). "No other pleadings shall be allowed, except that a court may order a reply to an answer or a third-party answer." *Id.* Likewise, Section 3011 of the New York Civil Practice Law and Rules ("Section 3011") sets forth the "kinds of pleadings" appropriate for use in New York state courts. N.Y.Civ.Prac.L. & R. § 3011 (McKinney 1985). Section 3011 pro-

vides for a complaint, an answer, a cross-claim against plaintiff, a counterclaim or cross-claim against a not-yet-joined party, interpleader pleadings, third-party pleadings, a reply to counterclaim, and a reply to a reply. *See id.* The definition of "pleadings" in neither the Federal Rules of Civil Procedures nor the New York Civil Practice Law and Rules includes a motion for summary judgment. Section 1213 requires an unauthorized insurer or reinsurer to post security only if it files a "pleading." N.Y.Ins.L. § 1213(c)(1)(A) (McKinney 1985). GK has not filed a "pleading" in the instant case—it has moved for summary judgment. Accordingly, Section 1213 is inapplicable.

GK's third argument in favor of this Court's ability to immediately consider its motion for summary judgment is that Allstate has failed to comply with the Second Circuit's interpretation of Rule 56(f) in *Burlington.* To reiterate, in order to delay a court's consideration of a summary judgment motion, a non-movant must file an affidavit explaining: (1) the nature of the uncompleted discovery; (2) how those facts are reasonably expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts; and (4) why those efforts were unsuccessful. *Burlington,* 769 F.2d at 926. In the instant case, Allstate objected to the timeliness of GK's motion for summary judgment only in its opposition brief. (Pltf.'s Opp. Memo at 11–14.) Allstate failed to file an affidavit in support of its position that summary judgment was premature due to the parties' incomplete discovery. While this failure alone is sufficient to reject Allstate's objections, *see Brae Transp. Inc. v. Coopers & Lybrand,* 790 F.2d 1439, 1443 & 1443 n. 3 (9th Cir.1986); *Cassidy, Inc. v. Hantz,* 717 F.2d 1233, 1235 (8th Cir. 1983), this Court finds that, even if Allstate had properly filed an affidavit, it would be unable to state facts sufficient to justify a delay in considering GK's summary judgment motion because this Court finds that Allstate failed to utilize available discovery against GK, even after it had actual notice of GK's intention to move for summary judgment.

As noted above, the November 1986 Order stayed discovery "unless specifically allowed by the Court upon application." (November 1986 Order at 2.) Allstate concedes that the purpose of this Order was to stay discovery until this Court ruled on defendants' motions to dismiss for lack of jurisdiction. (Forte Aff. ¶ 2.) On February 25, 1992, this Court denied these motions to dismiss in their entirety. *See* (February 1992 Order.) On August 21, 1992, GK advised Allstate and this Court that it was seeking permission to move for summary judgment. (GK Reply Memo at 7.) On January 3, 1994, GK filed and served its motion for summary judgment. *Id.* This Court denied GK's motion for failure to comply with this Court's Individual Rules, and GK re-filed its motion for summary judgment in accordance with this Court's Individual Rules in May 1994. *Id.*

Even assuming that discovery could not proceed until after this Court resolved defendants' jurisdictional motions, Allstate still had from February 1992, when this Court denied the jurisdictional motions, until May 1994, when GK's motion for summary judgment was properly filed, to pursue discovery. Moreover, Allstate had been aware of GK's intention to move for summary judgment since August 1992. Allstate concedes, however, that it elected not to undertake discovery in order "[t]o avoid incurring substantial expense." (Pltf.'s Opp. Memo at 16.) GK notes that "Allstate has not noticed any depositions nor served any interrogatories or document requests upon Groupe Kleber nor any other party." (GK Reply Memo at 7.)

In light of these facts, this Court finds that Allstate failed to avail itself of the opportunity to conduct discovery of GK despite Allstate's awareness of GK's intention to move for summary judgment, and that Allstate's request to delay this Court's consideration of GK's motion for summary judgment because Allstate requires additional discovery should be denied. The law is clear that Rule 56(f) is not a shield behind which "[a] party who both fails to use the time available and takes no steps to seek more time until after a summary judgment motion has been filed" may hide. *Burlington,* 769 F.2d at 928. It is undisputed that Allstate failed to seek additional time to conduct discovery prior to the time GK filed the instant motion for summary judgment. Moreover, Allstate concedes that this failure is a direct result of Allstate's conscious and strategic decision to forego discovery for over two years in an effort "[t]o avoid incurring substantial expense." (Pltf.'s Opp. Memo at 16.) It is neither the role of this Court, nor the burden of defendant GK, to relieve Allstate from the adverse consequences of its failed litigation strategies. This Court thus finds that Allstate's request for additional discovery in order to oppose GK's motion for summary judgment should be denied, and that GK's motion for summary judgment is not premature.

## II. CHOICE–OF–LAW

■ Before analyzing the parties' summary judgment arguments, this Court must first address the threshold issue of which law governs the instant dispute. Both parties assume, without argument, that New York law governs the contract issues in the instant case. That conclusion, however, does not appear to this Court to be self-evident.

■ As noted in this its 1995 Opinion in this case, this Court's subject-matter jurisdiction is based on the parties' diversity of citizenship. *Allstate,* 875 F.Supp. at 1025. Allstate is an Illinois corporation and defendants are foreign corporations, including GK, which is incorporated in France. Where subject matter jurisdiction is predicated upon diversity, this Court must apply the choice-of-law rules of the forum state, which in this case is New York. *Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989).

■ Under New York law, a court resolves choice-of-law questions regarding contract claims by applying an "interest analysis," pursuant to which "the 'law of the jurisdiction having the greatest interest in the litigation' controls." *M.H. Segan Ltd. Partnership v. Hasbro, Inc.,* 924 F.Supp. 512, 522 (S.D.N.Y.1996) (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Developers So., Inc.,* 933 F.2d 131, 137 (2d Cir.1991) (applying New York law)); *Intercontinental Planning Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (N.Y.1969).

Under New York's interest analysis, a court must consider five factors: (1) the place of contracting; (2) the place of the contract negotiations; (3) the place of the performance of the contract; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, places of incorporation, and places of business of the parties. *M.H. Segan,* 924 F.Supp. at 522; *see also State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld,* 921 F.2d 409, 417 (2d Cir.1990); Restatement (Second) of Conflict of Laws § 188(2) (1971). Additionally, if the parties support their respective legal arguments by relying solely upon New York law, and there is an absence of a strong countervailing public policy, a court may consider the parties' preferences as relevant to its choice-of-law determination and apply the law of New York. *M.H. Segan,* 924 F.Supp. at 522; *Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52 (2d Cir. 1984).

In the case at bar, this Court lacks most of the facts necessary for this Court's consideration of the five factors noted above because the parties did not brief the choice-of-law issue in their respective papers. Nevertheless, this Court finds that the parties have provided sufficient information for this Court to make an accurate choice-of-law determination. Allstate is an Illinois corporation and GK is a French company. The NESCO Treaties between NESCO and SLR were signed in New York by CJV, a New York company, on behalf of SLR. (Kummer Aff. at Exh. B.) Moreover, according to Allstate, NESCO paid its reinsurance premiums through its intermediary, Interbroker, to CJV at CJV's offices in New York City. (Pltf.'s Opp. Memo at 7.) Finally, both parties' submissions rely exclusively upon New York law. Accordingly, this Court finds that New York law governs the contract issues in the instant case. Having found that GK's motion for summary judgment is not untimely and that New York law governs the contract issues presented by this litigation, this Court will now consider GK's motion for summary judgment.

### III. SUMMARY JUDGMENT

Pursuant to Rule 56, summary judgement is appropriate where "the pleadings, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case on an issue which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). As the Second Circuit has noted, "[i]t has long been the rule that on summary judgment the inferences to be drawn from the underlying facts contained in [the moving party's] materials must be viewed in the light most favorable to the party opposing the motion." *Lendino v. Trans Union Credit Info. Co.,* 970 F.2d 1110, 1112 (2d Cir.1992) (quotation omitted).

To defeat a motion for summary judgment, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. If the adverse party does not respond to the motion for summary judgement, "summary judgement, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e).

In considering a motion for summary judgment, a court is not to resolve contested issues of fact, but rather, it is to determine the existence of any disputed issues of material fact. *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The existence of a genuine issue of

material fact depends on both the genuineness and the materiality of the issues raised by the motion. *See Scottish Air Int'l, Inc. v. British Caledonian Group*, 867 F.Supp. 262, 266 (S.D.N.Y.1994), *aff'd*, 81 F.3d 1224 (2d Cir.1996). Indeed, "the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam). To evaluate a fact's materiality, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While "disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted); *see Knight*, 804 F.2d at 11–12. According to the Supreme Court, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a judge or jury to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510 (quotation omitted). Nevertheless, "courts should not be reluctant to grant summary judgment in appropriate cases." *A.F.L. Falck S.p.A. v. E.A. Karay Co., Inc.*, 722 F.Supp. 12, 15 (S.D.N.Y.1989). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually insupportable claims," *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53, thereby permitting courts to avoid "protracted, expensive and harassing trials." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.) *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

GK moves for summary judgment on each count of plaintiffs' Complaint. Allstate disputes each of GK's arguments in support of its motion for summary judgment. This Court will consider GK's motion for summary judgement on each count individually.

### A. Count One: Breach of Contract

Count One of Allstate's Complaint alleges that "[d]efendants have breached their contractual relationships with [SLR] by failing to pay their percentage participations of claims due on the NESCO risks covered by [the NESCO Treaties]." (Complaint at 12.) Because SLR "has transferred and assigned to Allstate all rights which [SLR] had, has or will have against defendants concerning the NESCO risks[,]" Allstate seeks several judgments against defendants. *Id.*

In Count One, Allstate seeks: (1) "the total sum of $16,117,975, increased by further sums as may come due and decreased by such payments as may be made before entry of judgment, allocated among these defendants according to their percentage participation in the NESCO risks;" (2) "prejudgment interest at prime commercial lending rates from the dates each claim on the NESCO risks came due;" (3) "security from defendants for their percentage participations of future claims coming due on the NESCO risks;" (4) "a declaration that defendants are liable to provide reinsurance coverage to Allstate for the NESCO risks according to their percentage participations;" (5) "costs of suit and attorneys' fees;" and (6) "such other relief as the court may deem proper." *Id.*

GK offers two alternative arguments in support of its motion for summary judgment on Count One of Allstate's Complaint. First, GK argues that it is not a party to the Retrocession Agreement, and that it therefore cannot be liable to Allstate under it. (GK Memo at 8–11.) Second, GK argues that, even if it is a party to the Retrocession Agreement, GK is not liable to Allstate because the Retrocession Agreement expressly excludes "proportional treaties" such as the NESCO Treaties. This Court will discuss each of GK's alternative arguments in support of its motion for summary judgment individually.

### 1. GK's Argument That It Is Not A Party To The Retrocession Agreement

GK's first argument in support of its motion for summary judgment is that it is not a party to the Retrocession Agreement under which Allstate alleges that GK is liable to Allstate. (GK Memo at 8–11.) Instead, GK argues that it is an agent representing CCR and Nissan, and that CCR and Nissan

are the actual parties to the Retrocession Agreement. *Id.* GK thus argues that, because it is not a party to the Retrocession Agreement, it cannot be liable to Allstate. *Id.*

GK offers three pieces of evidence which it claims "clearly and unequivocally show[ ] that Groupe Kleber executed the Retrocession Agreement merely as an agent for its disclosed principals, CCR and Nissan[.]" (GK Memo at 8.) The first such piece of evidence is "[t]he signature stamp on the Retrocession Agreement [which] shows that Groupe Kleber executed the Retrocession Agreement on behalf of" Nissan and CCR. *Id.* GK contends that "the stamp on the Retrocession Agreement is the one that Groupe Kleber used to bind Groupe Kleber pool members (such as CCR and Nissan) to reinsurance contracts during the relevant period." *Id.;* (Benhamou Cert. ¶ 7.) Accordingly, GK argues, Nissan and CCR—not GK—were the retrocessionaires under the Retrocession Agreement. (GK Memo at 8–9.)

GK next offers sworn statements from "[t]wo of Groupe Kleber's top officials[,] Paul–Alain Plenet [ ("Plenet") ] and Stephane Benhamou [ ("Benhamou") ], [who] have certified under penalty of perjury that Groupe Kleber 'never acted as an insurance or reinsurance company in France or any other jurisdiction.'" *Id.* at 9. In their statements, Plenet and Benhamou each assert that GK "merely acted as an agent for the 'Groupe Kleber Co–Reinsurance pool,' which was comprised of various insurance or reinsurance companies including CCR and Nissan." *Id.;* (Benhamou Cert. ¶¶ 3–5); (Plenet Cert. ¶ 3.) Moreover, Benhamou contends that "Groupe Kleber is not now and has never been a member of any reinsurance pool (the "POSA Pool") ... [and] since Groupe Kleber was never an insurance or reinsurance company ... it would be impossible as a matter of law for Groupe Kleber to be a member of a reinsurance pool." (Benhamou Cert. ¶ 8.)

The third piece of evidence that GK submits to establish that GK was not one of SLR's retrocessionaires is its own 1979 promotional brochure. *Id.* That brochure describes GK's reinsurance activities as follows:

We underwrite for various first class Companies well spread over the world. . . . The main aim of the underwriting side consists in welcoming new Companies and, of course, in writing for them a profitable reinsurance portfolio.

*Id.;* (Benhamou Cert. ¶ 6.)

According to GK, these evidentiary items are significant because they prove that GK executed the Retrocession Agreement as an agent for disclosed principals. GK asserts that, under New York law, an agent who signs an agreement on behalf of a disclosed principal is not liable for the principal's obligations arising under that contract, absent an explicit agreement to the contrary. (GK Memo at 10.) As a result, GK asserts that, "to the extent Allstate has any claim at all, it is against Groupe Kleber's disclosed principals, *not Groupe Kleber.*" *Id.* at 8 (emphasis in original). Moreover, GK argues that, under New York law, "there is a presumption against an agent's liability[ ] that can be overcome only in the face of *overwhelming evidence.*" *Id.* at 10 (quotation omitted) (emphasis in GK Memo). GK thus contends that, in order to defeat the instant motion for summary judgment, Allstate must meet a "heightened evidentiary burden," and that the record in the instant case "is totally devoid of *any* evidence of an intention by Groupe Kleber to be liable under the Retrocession Agreement." *Id.* at 10–11 (emphasis in original).

In opposition to GK's motion for summary judgment on Count One, Allstate offers its own evidence to counter GK's "claim that any retrocession agreement that it entered into with [SLR] was solely as an agent on behalf of its disclosed principals and thus it is not liable to Allstate." (Pltf.'s Opp. Memo at 17.) First, Allstate asserts that the GK's citation of the retrocession agreement bearing GK's stamp is "disingenuous" because the retrocession agreement does not govern Groupe Kleber's reinsurance of the NESCO business. *Id.* Allstate therefore argues that, "[t]o the extent that this Retrocession Agreement has any relevance at all, it is to put the lie to Groupe Kleber's claim that it 'never acted as an insurance or reinsurance company in France or any other jurisdiction,'"

because the endorsement on the Retrocession Agreement contains the words "GROUP KLEBER," and directly below which is the phrase "co-reinsurance pool." *Id.* Allstate argues that "[n]othing on or near Groupe Kleber's indorsement even suggests that it was acting solely as an agent," nor does GK offer "any explanation how it, allegedly only a reinsurance agent, was a member of a 'co-reinsurance pool.'" *Id.*

Second, Allstate relies upon the sworn statement of James Kirkland ("Kirkland"), SLR's former Manager of International Relations. *Id.* Kirkland alleges that GK was a member of the POSA Pool and, as such, "shared in the premiums and claims according to its percentage participation contained on binding security lists prepared and distributed by the POSA Group," and "was responsible for its agreed upon percentage of the NESCO business." *Id.;* (Kirkland Cert. ¶¶ 6, 8.) Kirkland attaches to his certification a copy of the POSA Pool's binding security lists of the members of the POSA Pool that reinsured the NESCO risks and the members' respective percentage participation of those risks. (Pltf.'s Opp. Memo at 18–19.) GK is included on these lists as a member of the POSA Pool reinsuring 5.7875% of the NESCO business. *Id.* at 19.

Third, Allstate produces correspondence from SLR which Allstate claims establishes GK's participation in the POSA Pool and its reinsurance of the NESCO business. *Id.* In a letter dated November 22, 1983, from Plenet of GK to SLR, Plenet states that he was sending to SLR "a copy of the wording of the POSA's treaty [in which] we have been participating in 1977, 1978 and 1979. As you will reali[z]e[,] business were [sic] placed with POSA but also accepted by us from them." *Id.* (Forte Aff. at Exh. G.) According to Allstate, this letter concedes GK's membership in the POSA Pool. Allstate goes on to retort: "We leave it to Mr. Plenet to explain how, on one hand, he can affirm *today* that Groupe Kleber was never a member of the POSA Pool and, on the other, acknowledge, *before the threat of litigation* that Groupe Kleber was participating in 'POSA's treaty.'" *Id.* (emphasis in original).

In addition, Allstate offers four letters from Kirkland which Allstate claims "further confirm Groupe Kleber's percentage participation in the NESCO business." *Id.* at 20. On July 23, 1982, Kirkland sent a letter to NESCO, enclosing "lists of Pool Members participating at the time of your cessions." *Id.;* (Forte Aff. at Exh. H.) Attached to this letter is the list of POSA Pool members which includes GK's 5.7875% reinsurance of SLR's NESCO liability. (Pltf.'s Memo at 20); (Forte Aff. at Exh. H.) On December 15, 1982, Kirkland sent a letter to Interbroker, NESCO's reinsurance intermediary, along with a list of SLR's NESCO retrocessionaires that showed that GK had accepted 5.7875% of the NESCO business. (Pltf.'s Opp. Memo at 20); (Forte Aff. at Exh I.) On October 14, 1983, Kirkland again wrote a letter to NESCO stating that he was "in the process of obtaining agreements between Halvanon, Groupe Kleber and ourselves and I will send a copy of them as soon as I receive them from New York." (Pltf.'s Opp. Memo at 21); (Forte Aff. at Exh. J.) Finally, on July 2, 1984, Kirkland sent a telex to NESCO stating that he was "hereby providing you with the liabilities split of POSA's Pool." (Pltf.'s Opp. Memo at 21); (Forte Aff. at Exh. K.) This letter states that Groupe Kleber had 5.7875% liability for the NESCO risks. (Pltf.'s Opp. Memo at 21); (Forte Aff. at Exh. K.)

Fourth, Allstate argues that GK's 1979 promotional brochure "says nothing at all about Groupe Kleber's business in 1977, or [about] Groupe Kleber ever acting exclusively as a reinsurance agent." (Pltf.'s Opp. Memo at 21–22.) Instead, Allstate claims that the brochure undermines GK's claim that it has never been engaged in insurance or reinsurance because "[t]he very first sentence of the brochure ... states that '[w]e underwrite for various first class companies spread all over the world.'" *Id.* at 22. Because the term "underwrite" means "the party assuming the risk in return for payment of a premium", Allstate argues that GK's brochure "provides even further evidence of its reinsurance of the NESCO business." *Id.*

As noted above, a party seeking summary judgment bears the initial burden of demon-

strating the absence of a genuine issue of material fact. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1609. The movant may discharge this burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case on an issue which that party would have the burden of proof at trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2548. In order to defeat a motion for summary judgment, the non-movant must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). In considering a motion for summary judgment, a court is not to resolve disputed issues of material fact. *Knight,* 804 F.2d at 11. Rather, the court is only to determine the existence of contested issues of material fact. *Id.* If the court finds such a dispute, it must deny summary judgment. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1609.

Based on this Court's review of the foregoing evidence, this Court finds not one, but two, disputed issues of material fact which impact this Court's considerations of GK's motion for summary judgment on Count One. This Court finds disputed issues of material fact regarding: (1) whether GK was a member of the POSA Pool; and (2) whether GK was a party to the Retrocession Agreement.

First, this Court finds that the parties' respective submissions create a material issue of disputed fact regarding whether GK was member of the POSA Pool. Benhamou, one of GK's "top officials," states under oath that "Groupe Kleber is not now and never has been a member of any reinsurance pool (the "POSA Pool") managed by [CJV] and/or other affiliated companies." (Benhamou Cert. ¶ 8.) In direct contradiction to these statements, Allstate produces correspondence from Kirkland, attached to which are lists which appear to include GK as a member of the POSA Pool. (Pltf.'s Opp. Memo at 20–21); (Forte Aff. at Exhs. H, I, J & K.) GK has questioned the value of Kirkland's correspondence by stating that "the references to 'Groupe Kleber' in the documents is entirely consistent with Groupe Kleber's sta-

tus as a manager of a reinsurance pool. It is a common industry custom ... to use the pool manager's name [rather than its principals' names] when referring to the share of liability that a reinsurance pool has assumed." (GK Reply Memo at 14–15.) Nevertheless, this Court reiterates that, in considering the facts underlying a motion for summary judgment, it must draw all inferences in favor of the non-movant, Allstate. *Lendino,* 970 F.2d at 1112. Accordingly, this Court finds that, industry custom notwithstanding, Kirkland's letters' references to "Groupe Kleber" create a disputed issue of material fact regarding whether GK was a member of the POSA Pool.

Second, this Court finds that a material issue of disputed fact exists regarding whether GK was a party to the Retrocession Agreement. In support of its position that GK merely was an agent for Nissan and CCR—the entities GK maintains were the true parties to the Retrocession Agreement—GK proffers its 1979 brochure. (GK Memo at 9.) As previously stated, this brochure reads, in relevant part:

> We *underwrite* for various first class Companies well spread over the world.... The main aim of the underwriting side consists in welcoming new Companies and, of course, in writing for them a profitable reinsurance portfolio.

(GK Memo at 9 (emphasis added).) GK offers only the following explanation for submitting the brochure: "If there is any remaining doubt as to whether Groupe Kleber functioned as a non-risk bearing agent as opposed to risk bearing insurer or reinsurer, it is dispelled by Groupe Kleber's own 1979 promotional brochure." *Id.* This Court does not follow GK's reasoning, as the brochure excerpt appears to state that GK is a reinsurance underwriter. GK's rationale for submitting this brochure seems to have eluded Allstate as well. First, Allstate points out that the 1979 brochure does not address the relevant time frame for this litigation—1976–77. (Pltf.'s Opp. Memo at 21–22.) Second, like this Court, Allstate observes that the opening sentence of the brochure excerpt states that GK engages in underwriting. *Id.* at 22. In its reply submissions, GK argues

that the term "underwrite," as used in the brochure, is "generally understood in the insurance and reinsurance industries" to include the activities of reinsurance agents as well as those who directly act as reinsurers. (GK Reply Memo at 13 n. 15.) As previously noted, however, for purposes of resolving GK's motion for summary judgment, this Court must draw all inferences from the brochure in the manner most favorable to Allstate. *See Lendino,* 970 F.2d at 1112. As a result, this Court finds that the brochure supports both Allstate's contention that GK engaged in reinsurance business as a principal, not merely as an agent, and Allstate's claim that GK was a party to the Retrocession Agreement.

Accordingly, this Court finds that a disputed question of material fact exists regarding two issues: (1) whether GK was a member of the POSA Pool; and (2) whether GK was a party to the Retrocession Agreement. As a result, this Court finds that GK is not entitled to summary judgment on Count One based on its claim that it not a party to the Retrocession Agreement.

2. *GK's Argument That, Even If It Is A Party To The Retrocession Agreement, It Is Not Liable To Allstate Because The Retrocession Agreement Excludes "Proportional Treaties" Such As The NESCO Treaties .*

In support of its motion for summary judgment, GK argues that, even if GK is a party to the Retrocession Agreement, it cannot be liable to Allstate because the Retrocession Agreement expressly excludes "proportional treaties" such as the NESCO Treaties upon which Allstate's claim is based. For purposes of the instant argument only, this Court will assume *arguendo* that GK is a party to the Retrocession Agreement.

GK points out that the Retrocession Agreement contains a section of "exclusions" which eliminates several items from GK's potential liability under the agreement. (Benhamou Aff. at Exh B.) Listed among these excluded items is "All Proportional Treaty Business." *Id.* GK claims that the NESCO Treaties, as "quota share treaties,"

are "proportional treaties." (GK Memo at 13.) GK thus argues that, "because [SLR's] proportional treaty business is unambiguously not covered by and is excluded from the Retrocession Agreement," summary judgment on Count One is proper even if GK were a party to that agreement. (GK Memo at 13.)

In support of its claim that the NESCO Treaties are proportional treaties, GK directs this Court's attention to six provisions of the NESCO Treaties which allegedly establish that "NESCO agreed to cede, and [SLR] agreed to accept, a *proportional* share of NESCO's liability under the [1976 and 1977] NESCO [Treaties]." *Id.* at 15 (emphasis in original). GK states that each of these treaties provides that: (1) SLR "shall accept by way of reinsurance a [75% in 1976 or 80% in 1977] quota share of the business underwritten and produced by NESCO;" (2) "all loss settlements 'shall be binding on [SLR] *in proportion* to their participation;' " (3) SLR "shall be liable for their *proportionate share* of all expenses;" (4) Allstate "shall pay to [SLR] *a pro rata share* of the original net earned premiums received by [NESCO or Allstate] less [a ceding commission];" (5) SLR's reinsurance was "subject in all respects to ... [the] exact *proportion* of premiums paid [by the insureds] to [NESCO or Allstate] ... [with] the true intent of [the NESCO Treaties] being that the [r]einsurers shall ... in the *proportion* specified herein, follow the fortunes of [NESCO or Allstate];" and (6) alien, unlicensed reinsurers, like SLR, agree to establish "a clean irrevocable Letter of Credit ... in an amount equal to [r]einsurers' *proportion* of [NESCO's] loss reserves." *Id.* at 15–16 (all emphasis in GK Memo); (Cohen Aff. at Exhs. 3 & 4.) Accordingly, GK argues that summary judgment is appropriate because SLR's proportional reinsurance of NESCO does not fall within the scope of coverage in the Retrocession Agreement. (GK Memo at 16–17.)

To counter GK's alternative argument, Allstate asserts that "the Retrocession Agreement attached to its moving papers is apparently *not* the agreement that governs Groupe Kleber's reinsurance of the NESCO business." *Id.* at 17 (emphasis in original). All-

state argues that "[b]ased upon the evidence that Allstate has obtained from third parties ... Groupe Kleber obviously had at least one other reinsurance agreement with [SLR]." *Id.* at 3. Allstate further argues that the Retrocession Agreement is not the agreement which binds GK to Allstate because (1) it "facially applies only to non-proportional and facultative insurance, not the proportional NESCO risks that [SLR] insured through Groupe Kleber;" and (2) it "appears to indicate that Groupe Kleber had assumed a 70% [q]uota [s]hare of [SLR's] business, not the 5.7875% of the NESCO business which Groupe Kleber accepted from [SLR], as evidence by the POSA Group's binding security lists." *Id.* at 17–18. Finally, Allstate asserts that its failure to produce this "other agreement" is "not fatal" to its claim because it "has presented substantial evidence of Groupe Kleber's percentage participation in the NESCO business which ... raise substantial issues of material fact." *Id.* at 22.

In reply, GK expresses its surprise that Allstate, after "consistently assert[ing] in this action that its right to recovery against Groupe Kleber arises under the Retrocession Agreement between [SLR] and the Groupe Kleber Pool," in a "bizarre and desperate fall-back argument" now "attempts to repudiate its prior reliance on the Retrocession Agreement." (GK Reply Memo at 9–10.) In response to Allstate's newly raised claim "that there must be another treaty out there under which Groupe Kleber or Groupe Kleber's principals agreed to reinsure the NESCO Treaties," GK asks: "Where is this 'mystery agreement?'" *Id.* at 10–11. GK asserts that Allstate has not "come forward with a single document that refers to the mystery agreement directly or indirectly," even though "Allstate enjoys the full cooperation of [SLR's] management (including ... Kirkland, [SLR's] Manager of International Relations, who has already submitted a certification in this action on behalf of Allstate)." *Id.* Moreover, GK contends that "Allstate has offered no statement, certification or affidavit from anyone at [SLR] confirming (or at least suggesting the possibility) that the mystery agreement really exists." *Id.*

In addition, GK counters Allstate's argument that the Retrocession Agreement is not the governing agreement because this argument "appears to indicate that Groupe Kleber had assumed a 70%" liability instead of a 5.7875% liability. Referring to the text of the Retrocession Agreement, GK points out that the agreement merely authorizes GK to accept *"up to a 70%"* share of SLR's liability, (Benhamou Cert. at Exh. B (emphasis added)), but that the actual liability GK accepts may be less than 70%. (GK Reply Memo at 10 n. 11.) Thus, GK claims that the Retrocession Agreement permits GK's 5.7875% acceptance of liability, and that the 70% figure does not mean that another agreement governs GK's retrocession of SLR. *Id.*

To reiterate, a party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1609. The movant may discharge this burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case on an issue which that party would have the burden of proof at trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. In order to defeat a motion for summary judgment, the non-movant must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). In considering a motion for summary judgment, a court is not to resolve disputed issues of material fact. *Knight,* 804 F.2d at 11. Instead, the court is only to determine the existence of contested issues of material fact. *Id.* If the court finds such a dispute, it must deny summary judgment. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1609.

Moreover, the Second Circuit's standards for considering a summary judgment motion in a contract dispute are firmly established. "[I]n a contract dispute, summary judgment may be granted only where the language of the contract is unambiguous." *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1192 (2d Cir.1996)

(citation omitted). Under New York law, whether a written contract is unambiguous is a question of law for the trial court whose determinations will be reviewed *"de novo."* *Id.* (citing *W.W.W. Assoc. Inc. v. Giancontieri,* 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990)). Contract terms are ambiguous if they are

> capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Nowak,* 81 F.3d at 1192 (citation omitted). Conversely, "no ambiguity exists when contract language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion.'" *Sayers v. Rochester Tel. Corp. Supplemental Mgt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting *Breed v. Ins. Co. of N. America,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (N.Y.1978)).

 Even when parties dispute the meaning of specific contract clauses, a Court's task is "to determine whether such clauses are ambiguous when 'read in the context of the entire agreement.'" *Sayers,* 7 F.3d at 1095 (quoting *W.W.W. Assocs.,* 77 N.Y.2d at 163, 565 N.Y.S.2d 440, 566 N.E.2d 639); *see also Williams Press, Inc. v. New York,* 37 N.Y.2d 434, 440, 373 N.Y.S.2d 72, 335 N.E.2d 299 (N.Y.1975). By examining the entire contract, courts "safeguard against adopting an interpretation that would render any individual provision superfluous." *Sayers,* 7 F.3d at 1095 (citing *Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.,* 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465, 472 N.E.2d 315 (N.Y.1984)); *see also Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985); *Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 133 N.E.2d 688 (N.Y.1956). However, "[p]arties to a contract may not create an ambiguity merely by urging conflicting inter-

pretations of their agreement." *Sayers,* 7 F.3d at 1095 (citations omitted).

 Under New York law, insurance contracts are "governed by the rules of construction applicable to contracts generally." *Christiania Gen. Ins. Corp. of N.Y. v. Great American Ins. Co.,* 979 F.2d 268, 274 (2d Cir.1992) (citation omitted). Thus, applying the above principles to the instant case, this Court finds that the language of the NESCO Treaties unambiguously establishes that SLR accepted a proportional share of NESCO's liability. For example, each NESCO Treaty contains an identical provision governing the losses of NESCO ("the Company") and the obligations of SLR ("the Reinsurers"). Article Seven of each NESCO Treaty provides that:

> The Company alone and as its full discretion shall adjust, settle or compromise all claims and losses. All such adjustments, settlements, and compromises, including ex gratia payments, shall be binding on the Reinsurers *in proportion to their participation.* The Company shall likewise at its sole discretion commence, continue, defend, compromise, settle or withdraw from actions, suits or proceedings and generally do all such matters and things relating to any claim or loss as in its judgment may be beneficial or expedient, and *all loss payments made and costs and expenses incurred shall be shared by the Reinsurers proportionately. Reinsurers shall on the other hand, benefit proportionately from all reductions of losses by salvages, compromise or otherwise.*

(Cohen Aff. at Exhs. 3 & 4 (emphasis added)); *see also* (Kummer Aff. at Exh. B.) Allstate has not disputed the meaning of this provision. This Court thus finds that the language of Article Seven of the NESCO Treaties can have only one meaning: SLR is liable for a proportionate share of NESCO's losses. Accordingly, this Court finds that the NESCO Treaties' language regarding SLR's liability for NESCO's losses is unambiguous and that the NESCO Treaties are proportional treaties.

This Court further finds that the Retrocession Agreement under which GK agreed to become SLR's retrocessionaire unambiguous-

ly excludes SLR's proportional reinsurance treaties. (GK Memo at 13); (Benhamou Cert. at Exh. B.) As noted above, the Retrocession Agreement contains a list of the categories of losses excluded from GK's retrocession of SLR. (Benhamou Cert. at Exh. B.) Among these exclusions are "All Proportional Treaty Reinsurance Business." *Id.*

■ Allstate does not dispute the meanings of the above provisions of the NESCO Treaties and the Retrocession Agreement. Instead, Allstate argues that, "[b]ased upon the evidence that Allstate has obtained from third parties, which substantiates that Groupe Kleber was a member of the POSA Pool and reinsured a portion of [SLR's] reinsurance of NESCO, Groupe Kleber obviously had at least one other reinsurance agreement with [SLR]." (Pltf.'s Opp. Memo at 3.) Accordingly, Allstate contends that the Retrocession Agreement, which excludes from its coverage all proportional treaties, does not negate GK's liability to Allstate for its retrocession of SLR's reinsurance of NESCO. *Id.* at 17–18. Allstate, however, has not offered this Court any additional information concerning this alleged agreement.

To reiterate, a party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1609. To defeat a motion for summary judgment, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-movant must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356.

As stated earlier, this Court finds that GK has established that the NESCO Treaties are proportional treaties and that the Retrocession Agreement explicitly excludes coverage of SLR's proportional treaties. This Court consequently finds that GK has satisfied its burden on summary judgment. In order to avoid a grant of summary judgment on Count One in favor of GK Allstate must carry its burden by "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). This Court

finds that Allstate has not satisfied this burden.

By pointing this Court to some unspecified, unsubstantiated "other reinsurance agreement" between GK and SLR, Allstate has not set forth specific evidence or facts showing that there is a genuine issue for trial. Rather, the claims that Allstate makes regarding this "other reinsurance agreement" are little more than "naked allegations." *See Do–Re Knit, Inc. v. National Union Fire Ins. Co. of Pittsburgh*, 491 F.Supp. 1334, 1338 (E.D.N.Y.1980); *Cali v. Eastern Airlines, Inc.*, 442 F.2d 65, 71 (2d Cir.1971). Such allegations, without more, are insufficient to raise a genuine issue of fact that will protect a party from the entry of summary judgment. *Do–Re Knit*, 491 F.Supp. at 1338; 10A Federal Practice & Procedure § 2727, at 146–47. Allstate's various claims to the contrary do not require a different result. As previously discussed, Allstate's argument that it requires further discovery in order to obtain this document is meritless.

In addition, the case law that Allstate cites in support of its position on this issue is not controlling in the instant case. Allstate cites *A.F.L. Falck S.p.A. v. E.A. Karay Co., Inc.*, 722 F.Supp. 12, 16 (S.D.N.Y.1989), to support the broad propositions that a plaintiff's failure to produce documents upon which its claim is based is not fatal to the claim, and that an evidentiary hearing should be conducted to determine whether the documents exist. (Pltf.'s Opp. Memo at 22.) In *Falck*, a party sought summary judgment based on promissory notes that it could not produce. 722 F.Supp. at 16. In response to that motion, Judge Sweet noted that the "best evidence rule" requires that a "party seeking to prove the contents of a writing must establish a proper excuse for the non-production of the document and that the original did exist." *Id.* Judge Sweet explained that, in order to establish a proper excuse

> where that writing was last in control of the opposing party, if the proponent of the writing can show that the opponent had control over the document, that he had demanded the document from the opponent and that the opponent has failed to produce the document, secondary evidence

may be used to illustrate the existence of the document. [However,] [w]here the pleadings make clear that the proponent will need to prove, as a material element of his case, the contents of a specific document in the opponent's possession, the requirement of notice is satisfied.

*Id.* (internal citations omitted).

In the instant case this Court finds that Allstate has not established that another agreement between SLR and GK ever existed, much less that GK controlled it, that Allstate demanded it from GK, or that its pleadings provided GK notice of its reliance on another agreement. Accordingly, this Court finds that *Falck* does not support Allstate's position that its failure to produce the other agreement is not fatal to its claim. This Court further finds that, even if GK was a party to the Retrocession Agreement, it is not liable to Allstate because the Retrocession Agreement expressly excludes proportional reinsurance treaties such as the NESCO Treaties. Therefore, this Court finds that summary judgment should be granted to GK on Count One.

### B. Count Two: Breach of Implied Contract

In Count Two of its Complaint, Allstate seeks damages for defendants' alleged breach of an implied contract. Allstate claims that "at all relevant times defendants were members of the 'POSA Pool' which was formed by their agent [CJV]...." (Complaint at 13.) As members of the POSA Pool, "defendants engaged in a direct reinsurance relationship with NESCO by treating themselves as direct reinsurers of NESCO rather than [SLR] with respect to ... NESCO." *Id.* Allstate contends that "[t]his direct reinsurance relationship included, but was not limited to, direct accounting, direct payment of premiums, direct submission of claims and accounting data and direct communications as between NESCO and defendants through [CJV] on the NESCO reinsurance business." *Id.* Allstate maintains that CJV "conducted and carried out this direct relationship with NESCO on behalf of defendants with the knowledge, consent, acquiescence and active participation of defendants."

*Id.* Allstate further contends that "[b]y their own acts and conduct and that of their agent [CJV] ... defendants treated themselves as direct reinsurers of NESCO on the risks covered by [the NESCO Treaties]" in various levels of percentage participation. *Id.* at 13–15. Allstate alleges that GK's percentage participation in this manner was 5.2034%. *Id.* at 15. Allstate thus claims that "[d]efendants have breached their contractual relationships with NESCO by failing to pay their percentage participations of claims due" under the NESCO Treaties. *Id.*

In Count Two, Allstate "demands judgment against defendants for:" (1) "the total sum of $15,614,027, increased by such further sums as may come due and decreased by such payment as may be made before entry of judgment, allocated among defendants according to their percentage participations [in the NESCO Treaties];" (2) "prejudgment interest at prime commercial lending rates from the dates each claim [under] the NESCO [Treaties] came due;" (3) "security from defendants for their percentage participations of future claims coming due [under] the NESCO [Treaties];" (4) costs of suit and attorneys' fees; and (5) "such other relief as the court may deem proper." *Id.* at 15–16.

In support of its motion for summary judgment on Count Two, GK raises three arguments. First, GK claims that, absent specific language in the reinsurance treaty to the contrary, an insured cannot recover against a reinsurer. (GK Memo at 19.) Second, GK maintains that "a plaintiff cannot recover from a defendant on an implied contract theory when the subject matter of the 'implied contract' was governed by an express contract." *Id.* at 22. Third, GK contends that, because Allstate's implied contract claim "expressly depends upon the false factual premises that Groupe Kleber was a 'member of the POSA Pool,'" summary judgment is proper because GK "could not possibly have been a member of the POSA [P]ool because it is not and never has been an insurance or reinsurance company." *Id.* at 23. This Court will address each of GK's arguments for summary judgment on Count Two individually.

*1. GK's Argument That, Absent Express Reinsurance Treaty Language To The Contrary, An Insured Cannot Recover From a Reinsurer*

GK contends that "Allstate's 'implied contract' theory has been flatly rejected by the courts." *Id.* at 19. GK asserts that, pursuant to "well established principles of reinsurance law," in the absence of specific language in the reinsurance treaty to the contrary, an insured "cannot recover against a reinsurer." *Id.* Accordingly, GK argues that "[b]ecause the Retrocession Agreement contains no provision authorizing NESCO or its successor, Allstate, as one of [SLR's] reinsureds, to recover directly from Groupe Kleber under the Retrocession Agreement, Allstate's implied contract claim against Groupe Kleber must fail." *Id.* at 21. Alternatively, GK contends that, even if NESCO maintained a relationship sufficiently direct with its reinsurers to create direct liability with them, that liability would attach to the POSA Pool, of which GK claims it is not a part. (GK Reply Memo at 16.)

In opposition to GK's motion for summary judgment, Allstate argues that GK mischaracterizes relevant case law. Specifically, Allstate contends that an insured may recover from a reinsurer where "the insured ha[s] a direct relationship with the reinsurer," rather than a "typical insured/insurer/reinsurer relationship." (Pltf.'s Opp. Memo at 22.) Allstate thus argues that "Allstate (through its intermediary, Interbroker) had a direct reinsurance relationship with Groupe Kleber (through its agent, CJV)." *Id.* at 23. Allstate alleges that "[t]his direct relationship consisted of CJV's servicing the NESCO reinsurance business, including the handling and reporting of claims and the accounting, receipt and remission of premiums of the business written." *Id.* Allstate also claims that it "only dealt with its reinsurer, [SLR], once the POSA Group had disbanded." *Id.* As a result, Allstate argues that it is "entitled to pursue an implied contract claim directly against Groupe Kleber." *Id.*

Under New York law, in a typical insured/insurer/reinsurer relationship, the reinsurer does not examine risks, receive notice of loss from the original insured, or investigate claims. *Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.,* 4 F.3d 1049, 1054 (2d Cir.1993) (citation omitted) (applying New York law). On the contrary, "[i]n practice, the reinsurer has no contact with the insured." *Id.* Where this is the case, the relationship between an insurer and a reinsurer is one of indemnification only. *See id.* (citation omitted); *Travelers Indem. Co. v. Scor Reins. Co.,* 62 F.3d 74, 76 (2d Cir. 1995). Absent an express provision to the contrary, the reinsurer "has no privity with, and is generally not liable to, the original purchaser of the underlying policy." *Travelers,* 62 F.3d at 76 (citing *Delta Holdings, Inc. v. National Distillers,* 945 F.2d 1226, 1229 (2d Cir.1991), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1671, 118 L.Ed.2d 390 (1992)); *Unigard,* 4 F.3d at 1054; *Reliance Ins. Co. v. Aerodyne Engineers, Inc.,* 612 N.Y.S.2d 87, 87–88, 204 A.D.2d 944 (N.Y.App.Div.1994) (citation omitted); *Turner Constr. Co. v. Seaboard Surety Co.,* 447 N.Y.S.2d 930, 932, 85 A.D.2d 325 (N.Y.App.Div.1982). "The reinsured remains solely responsible under the original insurance contract and it alone has a claim against the reinsurer." *Reliance,* 612 N.Y.S.2d at 87–88, 204 A.D.2d 944 (citation omitted). As a result, an insured "ordinarily does not have a direct right of action against a reinsurer, since the reinsurance contract is one of indemnity to the original insurer," not to the insured. *Klockner Stadler Hurter, Ltd. v. Insurance Co. of Pa.,* 785 F.Supp. 1130, 1134 (S.D.N.Y.1990) ("*Klockner I*") (construing New York law).

Where the an insured consistently deals directly with its insurer's reinsurer, however, the reinsurer may become directly liable to the insured. For example, in *Klockner I,* a reinsurer's management company was alleged to have, "on behalf of [the reinsurer], directly handled all matters prior to and subsequent to loss, and dealt directly with [the insured]." *Id.* In denying a motion, brought by defendant management company, to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), Judge Conboy noted that "it appears that [the reinsurer's management

company and the insured], on behalf or the reinsurer, had a direct relationship that bypassed ... the insurer." *Id.* In a later opinion in the same case, *Klockner Stadler Hurter, Ltd. v. Insurance Co. of Pa.,* 780 F.Supp. 148 (S.D.N.Y.1991) (*"Klockner II "*), Judge Conboy denied in part defendant's motion for summary judgment because the insured "presented some evidence that [the reinsurer's agent] actually paid losses ... from its own account." *Id.* at 165. In his opinion, Judge Conboy stated that courts should consider two factors when determining whether a reinsurance agent is directly liable to an insured: (1) whether the reinsurance agent "was the ultimate, consistent reimburser of losses" of the insured; and (2) whether "this status was conveyed to" the insured. *Id.*

Situations where a reinsurer maintained so direct a relationship with an insured as to create direct liability to the insured appear to be rare. For example, in *Squibb–Mathieson Int'l Corp. v. St. Paul Mercury Ins. Co.,* 44 Misc.2d 835, 836, 254 N.Y.S.2d 586 (N.Y.Sup. Ct.1964), plaintiff sued to recover on an insurance policy issued by St. Paul Mercury Insurance Company, through co-defendant American Insurance Association (the "AIA"). 44 Misc.2d at 836–37, 254 N.Y.S.2d 586. The AIA moved for dismissal of the complaint because "it [was] not an insurer and [did] not conduct insurance business in its own name," even though it negotiated and paid claims arising under its members' insurance policies, including plaintiff's. 44 Misc.2d at 837–38, 254 N.Y.S.2d 586. Plaintiff countered that the AIA's activities established its liability directly to plaintiff. *Id.* The court in *Squibb–Mathieson,* however, found that the AIA's activities were "akin" to the activities of insurance "brokers" who are not liable on the policies they negotiate after delivering them to the insureds and collecting the premiums, and thus ruled that the AIA was not liable to plaintiff, and therefore granted the AIA's motion to dismiss. *Id.* The court explained that

> [a]ny implied understanding of the insured with respect to liability under the policy would, in the normal course, be merged into the formal insurance contract. That contract does not contain any indication of

any liability on anyone's part other than St. Paul.

*Id.; see also Cloud v. Illinois Ins. Exch.,* 701 F.Supp. 197, 200 (W.D.Okl.1988) ("[l]ike the association in *Squibb–Mathieson,* [defendant's] conduct in dispensing insurance policies and regulating its member syndicates resembles the conduct of actors in the insurance market—[such as insurance brokers]—that are generally not liable on insurance contracts ...").

In the instant case, there is no contract language explicitly establishing GK's liability. *See generally* (Benhamou Cert. at Exh B.) As discussed above, Allstate concedes that it can produce no contract specifically implicating GK. *See, e.g.,* (Pltf.'s Opp. Memo at 17.) Nevertheless, Allstate alleges that "Allstate (through its intermediary, Interbroker) had a direct reinsurance relationship with Groupe Kleber (through its agent, CJV)." (Pltf.'s Opp. Memo at 23.) To reiterate, Allstate contends that Interbroker was NESCO's "reinsurance intermediary," Interbroker, placed NESCO's reinsurance with CJV, "a reinsurance intermediary that had represented itself as acting on behalf of [SLR]." *Id.* at 5–6. Allstate claims that NESCO's "direct relationship [with GK] consisted of CJV's servicing of the NESCO reinsurance business, including the handling and reporting of claims and the accounting, receipt and remission of premiums on the business written." *Id.* Specifically, Allstate asserts that NESCO's "[p]remium payments were sent by NESCO to Interbroker ... which paid the premiums to CJV at its offices in New York City." (Kummer Aff. ¶ 9.) Allstate also contends that "between 1976 and 1979, NESCO received payment on claims under the NESCO Treaties which were submitted to CJV." *Id.* ¶ 10. Indeed, Allstate submits that NESCO dealt directly with CJV until CJV ceased operating in 1980, shortly after a federal grand jury commenced investigating potential criminal activities by the POSA Group. *Id.* ¶ 11.

This Court's research reveals that the standard applicable to resolving disputes regarding reinsurer/insured relationships is neither clear nor well settled. Nevertheless,

this Court finds that Allstate has presented sufficient evidence supporting both the existence of an applicable legal standard, and facts relevant to Allstate's arguments under that standard to create a material question of fact to survive GK's motion for summary judgment on this issue. As previously noted, Judge Conboy in *Klockner II* recommended that courts consider two factors when determining whether a reinsurance agent is directly liable to an insured. 780 F.Supp. at 165. This Court finds that Allstate has submitted proof of both factors. It has submitted evidence that: (1) the POSA Pool, through CJV, was "the ultimate, consistent reimburser of losses," and thus, was a risk-bearing entity with respect to the NESCO treaties. *See, e.g.,* (Kummer Aff. ¶ 9.) Allstate also has demonstrated that NESCO was aware of the POSA Pool's status as a risk-bearer through CJV because NESCO received payment and submitted claims directly to CJV. *See, e.g., id.* ¶¶ 9, 11.

Despite Allstate's showings, GK has submitted no rebuttal evidence. Instead, GK contends that the only direct relationship NESCO may have had was with CJV as agent for the POSA Pool, and that GK was not a member of this pool. (GK Reply Memo at 16.) Accordingly, GK claims that even if NESCO maintained a sufficiently direct relationship with CJV to justify imposing liability on the POSA Pool for NESCO's losses, this liability cannot be attributed to GK as a non-member.

This Court finds that the parties' competing claims regarding this issue create disputed issues of material fact rendering summary judgment inappropriate on Count Two. It is clear that a question exists regarding the legal standard applicable to this Court's resolution of the reinsurer/insured relationship question. It is further evident that GK has not met its burden of demonstrating that Allstate cannot prove any set of facts that would support its claims at trial. On the contrary, Allstate's papers contain evidence that could support Allstate's case at trial. Moreover, as this Court noted earlier, a material issue of disputed fact exists regarding GK's membership in the POSA Pool. Accordingly, this Court finds that GK's motion

for summary judgment on Count Two should be denied.

### 2. GK's Argument That There Can Be No Recovery Based On Implied Contract Where The Subject Matter Is Governed By An Express Contract

GK submits a second, alternative argument in support of summary judgment on Count Two. GK contends that "even if there was not a well developed body of reinsurance law completely negating Allstate's implied contract claim, that claim would be barred under established principles of general contract law." (GK Memo at 22.) GK asserts that, under New York law, a contract "cannot be implied *in fact* where the facts are inconsistent with its existence . . . or where there is an express contract covering the subject-matter involved." *Id.* (quotation omitted). Accordingly, GK argues that Allstate cannot recover on its implied contract theory because the "subject matter" of the alleged implied the contract—the recovery of reinsurance proceeds due under the NESCO Treaties—"was governed by express contracts, [the NESCO Treaties], and Groupe Kleber was not a party to those contracts." *Id.* at 22–23.

In opposition to GK's argument, Allstate asserts that under New York law, when parties enter into an express agreement, one party "is not precluded from recovering on a theory of quasi-contract or contract implied in law." (Pltf.'s Opp. Memo at 24–25.) Allstate contends that "[t]his is particularly true here because . . . the only retrocession agreement produced by Groupe Kleber does not govern the reinsurance relationship between [SLR] and Groupe Kleber concerning the NESCO risks. Rather . . . this is a subject requiring discovery, which to date has not yet commenced." *Id.* at 25. According to Allstate, the authorities cited by GK merely stand for the proposition that, if an express contract specifically covers a transaction that is the subject of an implied contract, there can be no recovery under "implied contract." *Id.* Allstate thus asserts that summary judgment is inappropriate because,

without having conducted any discovery from GK, "Allstate cannot possibly determine whether there is a written reinsurance agreement between [SLR] and Groupe Kleber that expressly covers the same subject matter as the implied contract between Allstate and Groupe Kleber." *Id.* at 25–26.

In reply to Allstate's arguments, GK claims that "Allstate ... misses the point," because "[t]he express agreement that covers the transaction [are] the [NESCO Treaties] between NESCO and [SLR], *not* the Retrocession Agreement (or any other agreement) between [SLR] and Groupe Kleber." (GK Reply Memo at 22 (emphasis in original).) GK argues that "[s]ince Allstate does not (and cannot) dispute the existence of those agreements, and that they cover the transaction that is the subject of the implied contract, Allstate's implied contract claim is barred as a matter of law." *Id.*

 Under New York contract law, "[a]n implied-in-fact contract arises in the absence of an express agreement, and is based on the conduct of the parties from which a fact-finder may infer the existence and terms of a contract." *AEB & Assocs. Design Group, Inc. v. Tonka Corp.*, 853 F.Supp. 724, 731 (S.D.N.Y.1994) (citation omitted). "[I]t is well settled that a contract may be implied in fact where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *Matter of Boice*, 640 N.Y.S.2d 681, 682, —— A.D.2d —— (N.Y.App.Div.1996) (citation omitted). However, "[t]he prerequisite for such a contract is that there be no express agreement dealing with the same subject matter." *Julien J. Studley, Inc. v. New York News, Inc.*, 70 N.Y.2d 628, 629, 518 N.Y.S.2d 779, 780, 512 N.E.2d 300, 301 (N.Y.1987). Moreover, "[a] contract cannot be implied-in-fact where the facts are inconsistent with its existence ... or against the intention or understanding of the parties." *Tjoa v. Julia Butterfield Memorial Hosp.*, 612 N.Y.S.2d 676, 677, 205 A.D.2d 526 (N.Y.App.Div.1994) (citation omitted).

This Court finds that a disputed issue of material fact exists regarding GK's claim that Allstate may not recover on its implied contract claim because the subject matter of this claim is governed by an express contract, and that this disputed issue of fact renders an award of summary judgment on this claim inappropriate. The parties' respective papers reveal a question of fact regarding which, if any, of the numerous contracts in this litigation govern the subject matter of Allstate's implied-contract claim. GK asserts that the NESCO Treaties control the subject matter of instant claim, and that consequently, Allstate's implied contract claim is barred as a matter of law. *See* (GK Memo at 21–22); (GK Reply Memo at 22.) Allstate rejects GK's position, and maintains that it requires further discovery to determine whether an express agreement exists concerning the subject matter of this claim. (Pltf.'s Opp. Memo at 25–26.) Moreover, although neither party takes this position, this Court notes that the Retrocession Agreement itself could contain terms that govern the subject matter of Allstate's implied-contract claim. Accordingly, this Court finds that the question of which, if any, of the contracts underlying the instant litigation govern the subject matter of Allstate's implied contract claim is a question for the trier of fact. This Court thus finds that GK's motion for summary judgment on this issue should be denied.

*3. GK's Argument That Allstate's Implied Contract Claim Is Barred Because GK Was Not A Member of The POSA Pool*

GK's third argument in favor of summary judgment on Count Two is that Allstate's implied contract claim

> expressly depends upon the false factual premise that Groupe Kleber was a member of the POSA Pool; that as a member of the POSA Pool, Groupe Kleber engaged in a direct reinsurance relationship with NESCO by treating itself as a direct reinsurer of NESCO rather than [SLR] with respect to the NESCO risks; and that [CJV] conducted and carried out this direct reinsurance relationship with NESCO on behalf of Groupe Kleber.

(GK Memo at 23 (quotations omitted).) GK claims that "[a]s a threshold matter, Groupe

Kleber could not possibly have been a member of the POSA Pool because it is not and never has been an insurance or reinsurance company." *Id.*

This Court previously has found that there exists a disputed issue of material fact concerning whether GK was a member of the POSA Pool. Because the instant argument by GK in support of summary judgment on Count Two is based upon GK's contention that it was not a member of the POSA Pool, this Court finds that GK's motion for summary judgment on Count Two should be denied.

### C. Count Three: Unjust Enrichment

■ In Count Three of its complaint, Allstate asserts that, "[b]etween 1976 and 1980[,] defendants received, or their agent [CJV] received on their behalf, a benefit from NESCO in the form of premiums for reinsurance coverage of the NESCO risks in the total amount of $9,081,063.65." (Complaint at 16.) Allstate contends that "NESCO paid these premiums based upon the expectation that claims on the NESCO risks would be paid when due." *Id.* Allstate further maintains that "[w]ith the exception of the initial loss payments in the amount of $548,487 made on behalf of defendants out of the premiums paid by NESCO, defendants have failed and refused to pay any further claims falling due on the NESCO risks despite demand." *Id.* Accordingly, Allstate claims that "defendants have been unjustly enriched by the receipt and retention of reinsurance premiums from NESCO in the total amount of $8,532,576.65 and the investment income which was or could have been thereon." *Id.*

In satisfaction of these claims, Allstate "demands judgment against the defendants for: (a) the sum of $8,532,576.65 allocated among the defendants according to their percentage participations in the reinsurance premiums paid by NESCO; (b) prejudgment interest at prime commercial lending rates from the dates each premium payment was made; (c) attorneys' fees and costs of suit; and (d) such other relief as the court may deem proper." *Id.* at 17.

In support of its motion for summary judgment on Count Three, GK argues that GK "has no record of having received any premium from NESCO or [SLR] attributable to the NESCO Policies." (GK Memo at 25); (Benhamou Cert. ¶ 10.) GK also asserts that "it is indisputable that Groupe Kleber was not a POSA Pool member and it is indisputable that [CJV] never acted as Groupe Kleber's agent for receipt of premium: (a) from NESCO attributable to the NESCO Policies; or (b) from [SLR] attributable to the Retrocession Agreement." (GK Memo at 25.) GK thus argues that summary judgment is appropriate on Count Three because, "while NESCO may have paid premium to [SLR] or to [CJV] for reinsurance coverage of the [NESCO Treaties], such payments would *not* constitute payment to Groupe Kleber, and Groupe Kleber cannot be deemed to have received such payments." *Id.*

Allstate offers two arguments to counter GK's claim that summary judgment is proper because there is no "paper trail" establishing that GK received payments traceable to NESCO. First, Allstate contends that, despite the absence of a paper trail establishing such premiums, GK does not—and cannot—claim that such premiums were never paid to GK. (Pltf.'s Opp. Memo at 26.) Allstate maintains that each POSA Pool member shared in premiums according to its respective percentage participation and that, because the POSA Group's "binding security lists confirm Groupe Kleber's 5.7875% participation in the 1977 [NESCO] Treaties, it should have received from its agent, the POSA Group, 5.7875% of NESCO's premiums." *Id.* Second, Allstate argues that, "[w]hile Allstate does not currently have in its possession documents that reflect the exact amount of premiums that Groupe Kleber has received, in view of the lack of an opportunity for discovery, the absence of those documents, at this juncture, does not warrant a dismissal of the unjust enrichment claim." *Id.* at 27. Allstate contends that summary judgment is particularly inappropriate because this case's "complex web of insurers and reinsurers" makes "determining whether Groupe Kleber actually received any premiums attributable to the NESCO policies ...

a difficult question that will require a thorough factual analysis." *Id.*

 The doctrine of "unjust enrichment" is the general principle that "one person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained or appropriated, where it is just and equitable that such restitution be made." *Black's Law Dictionary* 1377 (5th ed. 1979). *Quantum meruit* is "[a]n equitable doctrine, based on the concept that no one who benefits by the labor and materials of another should be unjustly enriched thereby; under those circumstances, the law implies a promise to pay a reasonable amount for the labor and materials furnished, even absent a specific contract therefor." *Id.* at 1119. Although Allstate does not specifically plead the remedy of *quantum meruit,* it is relevant to the instant case because unjust enrichment and *quantum meruit* "are usually analyzed together[,] as these two doctrines are related theories that are best addressed as a whole[,] since the latter is merely the means by which the former is remedied." *Newman & Schwartz v. Asplundh Tree Expert Co.,* 917 F.Supp. 265, 270 (S.D.N.Y.1996) (quotation omitted) (applying New York law); *see also Benevento v. RJR Nabisco, Inc.,* No. 89 Civ. 6266, 1993 WL 126424, at *6 (Apr. 1, 1993 S.D.N.Y.); *Seiden Assocs, Inc. v. ANC Holdings, Inc.,* 768 F.Supp. 89, 96 (S.D.N.Y.1991), *rev'd on other grounds,* 959 F.2d 425 (2d Cir.1992). *Quantum meruit* is "awarded when one should be compensated ... in order to prevent the unjust enrichment of another." *Newman & Schwartz,* 917 F.Supp. at 270. The elements of a claim for *quantum meruit* are: (1) plaintiff conferred a benefit upon defendant; (2) defendant accepted that benefit; and (3) plaintiff expected compensation for the reasonable value of the benefit. *GSGSB, Inc. v. New York Yankees,* 862 F.Supp. 1160, 1170 (S.D.N.Y.1994) (applying New York law); *Moors v. Hall,* 532 N.Y.S.2d 412, 414, 143 A.D.2d 336 (N.Y.App.Div.1988); *see also Newman & Schwartz,* 917 F.Supp. at 270 n. 7.

In the case at bar, this Court finds that there exists a disputed issue of material fact regarding at least the first two elements of Allstate's *quantum meruit* claim. Allstate has established that NESCO paid nearly $10,000,000 in premiums to its insurance intermediary, Interbroker, which paid these premiums to CJV, which in turn paid them to the members of the POSA Pool. (Pltf.'s Memo at 26); (Kummer Aff. ¶ 9.) This Court previously has found, however, that whether GK was a member of the POSA Pool is a disputed issue of material fact. Accordingly, this Court finds that whether GK, as a member of the POSA Pool, had benefits conferred upon it by NESCO or accepted those benefits are disputed issues of material fact. As a result, this Court finds that GK's motion for summary judgment on Count Three should be denied.

### CONCLUSION

IT IS HEREBY ORDERED THAT GK's motion for summary judgment on Count One is GRANTED.

IT IS FURTHER ORDERED THAT GK's motion for summary judgment on Count Two is DENIED.

IT IS FURTHER ORDERED THAT GK's motion for summary judgment on Count Three is DENIED.

SO ORDERED.